[Sac. No. 4041. In Bank.—May 3, 1935.]

TULARE IRRIGATION DISTRICT et al., Plaintiffs and Respondents; H. E. WRIGHT et al., Interveners and Respondents, v. LINDSAY–STRATHMORE IRRIGATION DISTRICT, Appellant.

494

Sloss & Ackerman, Sloss, Turner & Finney, Power & McFadzean, Power, McFadzean & Crowe, W. G. Irving and Guy Knupp for Appellant.

Marietta R. Gray, *in pro. per.*, W. R. Bailey, Farnsworth, Burke & Maddux and H. Scott Jacobs for Respondents.

WASTE, C. J.—This action was instituted by the various plaintiffs to quiet their title as against defendant to the surface and underground waters of the Kaweah delta and to enjoin the defendant, the Lindsay-Strathmore Irrigation District, from pumping any of the water from the underground waters of the delta and transporting the same out of the Kaweah watershed to lands within the defendant district. After a protracted trial, judgment was entered in favor of all of the plaintiffs and interveners, enjoining the defendant from pumping any water from the underground waters of the delta and transporting the same to the lands of defendant district, and likewise enjoining the defendant from taking, diverting, or carrying away from the Kaweah River, or any of its branches, any quantity of water whatsoever, except that required by defendant for riparian purposes on its riparian lands located within the delta. Contemporaneously with the entering of its judgment, the trial court suspended the operation of the injunction, subject to certain conditions, pending the appeal.

The litigation here involved has been of long duration. The original complaint was filed on July 15, 1916. After issue was joined, a trial was had before Judge Wallace, sitting as a trial judge in Tulare County. After Judge Wallace had signed and filed his decision in writing (in favor

of plaintiffs), defendant raised the objection that the trial judge was disqualified because of interest. In *Lindsay-Strathmore Irrigation District* v. *Superior Court*, 182 Cal. 315 [187 Pac. 1056], the contentions of petitioner there (defendant here) were sustained, and a writ of prohibition was issued restraining Judge Wallace from taking any further action in the case, and ordering a new trial. The case again proceeded to trial, this time before Judge Albert Lee Stephens. During the course of this trial, consuming over two hundred court days, a reporter's transcript of fifty-six volumes, containing 26,936 pages, was compiled, and some 678 exhibits were introduced. The findings of fact and conclusions of law, covering 236 pages of the clerk's transcript, were filed May 16, 1925, and judgment was thereafter rendered on April 13, 1926, in favor of plaintiffs and interveners. Counsel consumed over five years in the preparation of briefs, which, without their accompanying supplements, total 1957 pages. Now, some eighteen years after the action was commenced, the case comes before this court for the first time on its merits.

The case was rendered very complex for the reason that respondents are many in number and own, or claim to own, a variety of water rights on approximately 200,000 acres of land. Some of the respondents are appropriators, some are riparian owners, and some are owners of overlying land, owning or claiming to own underground water rights. Sixteen of the respondents are corporations distributing appropriated water to their hundreds of stockholders; one respondent is an irrigation district, also distributing appropriated water to its landowners; thirty are individual appropriators, alleged to hold rights in the water as tenants in common; and thirteen claim both as riparian owners and overlying landowners. Different questions of law were presented to the trial court and are now presented here, in reference to each class of respondent. Moreover, since the action is one to quiet each plaintiff's title to the water as against defendant, different questions of fact are presented as to each plaintiff.

As opposed to these respondents, there is but one defendant and appellant, the Lindsay-Strathmore Irrigation District. Its main lands are located outside the delta proper, and most of the lands within the district are slightly higher

than the lands of respondents. It is a public corporation, organized in 1915, under the Irrigation District Act of 1897 and amendments thereto. (Stats. of 1897, p. 254.) It owns a large ranch designated as the Rancho de Kaweah, located on the Kaweah delta and partially riparian to the Kaweah River. It desires, by means of wells and pumping plants, to pump from the waters underlying this ranch 25,000 acre feet of water yearly, and to transport and use this appropriated water for irrigation purposes on farm lands within the district some twelve miles away.

At the threshold of this case two admitted facts stand out which are of paramount importance:

1. The rights of appellant, as riparian owner of the Rancho de Kaweah, are not involved on this appeal. The rights of appellant, as such riparian owner, were admittedly protected by the judgment of the lower court.

2. No question of priority between respondent appropriators and appellant is presented. Appellant has conceded at all stages in this controversy that, whatever the rights of respondent appropriators may be, such rights are prior in time and, therefore, paramount to any right of appellant to take water by means of appropriation for use on lands within the district, and not riparian to the Kaweah River. Appellant does strenuously contend, as will hereafter appear, that the amount of water heretofore used by these respondent appropriators has not been all put to beneficial uses, but it expressly admits that respondent appropriators have a claim prior in time and right to any right of appellant as an appropriator to whatever quantity respondents prior to 1916 put to a beneficial use.

The Kaweah River is a natural water course having its sources in the western slope of the Sierra Nevada Mountains in the eastern part of the county of Tulare. This river flows down the mountain slopes, through Tulare County, in a southwesterly direction, to a point in the valley known as McKay Point. At this point, the Kaweah River divides into two channels. The northerly channel from McKay point westerly, for a distance of about twenty-two miles, is known as the St. Johns River, and, thereafter, is known as Cross Creek. The southerly channel, from McKay Point westerly for a distance of about nine miles, is known as the Kaweah or Lower Kaweah River (which for

the sake of clarity, will hereafter in this opinion be referred to as the Lower Kaweah River) and, thereafter is known as Mill Creek. The waters of the Kaweah River, for many years, and in accordance with the judgment of the court in an action to which appellant was not a party, have been divided by the plaintiff ditch companies and by the plaintiff Tulare Irrigation District and others, not including appellant, by means of a concrete weir located at such point, by means of which the flow of the Kaweah River is evenly divided so that one-half of the waters thereof flow down the St. Johns River and one-half down the Lower Kaweah River, except that when the water in the Kaweah River at McKay Point decreases to 80 cubic feet per second after the snow run off of each year, then all the water is turned down the channel of the Lower Kaweah River and continues entirely to flow down that channel until the first day of October, and, thereafter, until the quantity at Mc-Kay Point exceeds 80 cubic feet per second, when it is again evenly divided.

The Kaweah River has all of the characteristics of streams that have their source in the high Sierra Nevada Mountains. Its principal supply is derived from the snows which fall in the high altitudes during the winter months and then, by a process of melting and freezing, are compacted in the form of ice and snow crust and so remain until melted by the warm suns of the spring and early summer months. The winter supply of water in the river is derived principally from rains which fall at intervals in the foothills and upon the valley floor. Above McKay Point, the Kaweah River drains an area of about 600 square miles of the western slopes of the Sierra Nevada Mountains, which area forms a separate and distinct watershed. As might be expected from such a stream, the surface flow is extremely variable. The court found that the flow of the river "varies greatly in amount of flow and in rate of flow from year to year, from season to season, from day to day, and from hour to hour". This finding is amply supported by the evidence and all the parties to this appeal concede it to be true.

From McKay Point, extending westerly and southwesterly therefrom, and comprising a portion of the floor of the San Joaquin Valley, there exists an alluvial fan or delta

built up through the years by the Kaweah River. This Kaweah delta comprises in all more than 300,000 acres, and it is on this delta that the lands irrigated by the various respondents are located.

The delta is generally triangular in shape, having its apex at McKay Point, and sloping gradually downward from McKay Point. About seven miles westerly from Mc-Kay Point there are certain small mountains known as the Venice hills, which control the course of both branches of the Kaweah River westerly from McKay Point. These hills divide the delta into two ·parts. That portion of the delta lying east of the Venice hills is known as the basin, containing 7,200 acres. The alluvium therein is of a sandy and porous nature, extending to bedrock and varying from 100 to in excess of 400 feet in depth. Appellant's ranch, the Rancho de Kaweah, upon which are located the wells from which it secures the water, the transportation of which away from the rancho caused this action to be brought, is located in the basin, about five miles westerly from McKay Point. As already stated, the rancho is in part riparian to the Lower Kaweah River, extending on both sides thereof.

The St. Johns River, the northerly branch of the Kaweah River, passes westerly from McKay Point along or near the northerly boundary of the basin and leaves the basin through an opening in the Venice hills known as St. Johns Gap. The Lower Kaweah River passes in a southwesterly direction from McKay Point along or near the southerly boundary of the basin to what is known as the Kaweah Gap, between the Venice hills and the so-called red lands to the south. That portion of the Kaweah delta lying westerly from the Venice hills is called the Lower Kaweah delta. It is of a minimum width of slightly more than two miles immediately below the gaps in the Venice hills, and then widens rapidly westward beyond the west boundary of Tulare County and ultimately merges into the delta of the Kings River. Upon the Lower Kaweah delta are located the towns of Visalia and Tulare, and other towns and thousands of farms, and it is on this portion of the delta that the major portion of the lands irrigated by respondents is located. The soils of the delta are sandy and highly porous, and extend to .great depths before bedrock is encountered. The soils are highly fertile and the lands therein are intensely farmed. The

lands adjoining the delta on the southeast and on the north are composed largely of adobe and clay, referred to by the witnesses as "red lands", through which water will not percolate readily. These red lands effectually prevent any material percolation of the underground waters off the delta in the directions mentioned.

The Lower Kaweah delta is not only traversed by the St. Johns and Lower Kaweah Rivers, but also almost its entire area is covered with a network of streams, canals, sloughs and ditches, by means of which the water is carried to the lands irrigated. The underground water level has always been high, the delta constituting a huge underground reservoir. The trial court found that these underground waters are diffused percolating waters which extend "downward from a few feet of the ground surface to a great depth and many miles in width, moving generally with the surface slope and at right angles to the surface contours of the delta at various depths beneath the surface of the said delta".

The court likewise found that prior to 1918 the underground water table in the major portion of the Lower Kaweah delta had been falling to an extent sufficient to increase substantially the cost and difficulty of pumping water therefrom for use on overlying lands. The prevailing crops on the delta are alfalfa, fruit trees, timber, grain, field crops, and other agricultural products. An appreciable portion of the delta is devoted to wild pasture. All of the respondents use the huge underground reservoir either for direct irrigation by means of wells and pumping plants or for the support of the rivers or for subirrigation.

The appellant, as already pointed out, is an irrigation district, organized in 1915. The lands included within the district proper are almost due south from McKay Point and some twelve to fifteen miles therefrom. The district has a surface area of about 16,000 acres and its lands are entirely within Tulare County. All of the lands within the district are susceptible to irrigation, and over 14,000 acres are suitable for the growing of oranges and other citrus fruits, which is the principal crop grown thereon. In 1916, which this action was commenced, landowners within the district had approximately 6,000 acres planted in citrus fruits and, since the action was commenced and up until the present trial, in spite of the dispute over their claim to

water, landowners within the district have planted an additional 3,000 acres in citrus trees of various kinds. Citrus fruits, in the district in question, cannot be grown successfully without the use of water for irrigation. Because of the tremendous increase in the use of the water within the district, its water supply began to fail as early as 1913. The trial court found that although underneath the lands of the district there is an underground body of water, the use of the same for irrigation purposes by the district has caused an excessive drain thereon, so that the water pumped from a majority of the wells in the district is now heavily impregnated with salt, and that such body of water is inadequate for the reasonable needs of the landowners within the district; that there is no supply of water available within the district which is adequate for the needs of the landowners therein; "that it is necessary in order to prevent the majority of the trees and fruits and grasses growing on the lands within said district from withering and dying, and to prevent the major portions of said lands from becoming arid and useful only for dry farming, for the said District to have a supply of water conveyed to the lands within said District from some source outside of and away from said District". The court also found that if the lands within the district be deprived of water, the citrus trees growing thereon will die; that the lands within the district planted to citrus trees "are of the reasonable value on the average of approximately twelve hundred and fifty dollars per acre; that the said lands without water for irrigation would not exceed fifty and no/100 ($50.00) Dollars per acre in value".

Faced with the necessity of securing outside and necessary water, the landowners organized the defendant district in 1915. Immediately thereafter the district purchased the Rancho de Kaweah, located in that portion of the delta known as the basin. In addition to its underground supply, the rancho in part is riparian to the Lower Kaweah River and is upstream from most of the lands of respondents, and upstream from most but not all of the points of diversion used by respondents. After the purchase of the rancho, the district started the boring of wells thereon for the purpose of tapping the underground waters of the basin. Over a period of time, some 39 wells were drilled and electric pumps installed therein. These pumps and wells were then con-

nected with a general irrigation system consisting of 9 miles of banded wood stave pipe; 6½ miles of 48-inch continuous wood stave pipe; 12 miles of concrete-lined ditches; 85 miles of riveted steel pressure pipe and 2 high head pumping plants. The total irrigation system cost $1,600,000. This system was designed to pump from the waters underlying the rancho 25,000 acre feet annually and to carry a maximum head of 75 cubic feet of water per second. The district did not begin actual pumping operations on the rancho for use within the district until 1918. During the period 1918 to the time of trial in 1922, the district pumped between 13,000 and 15,000 acre feet per year from the rancho and conveyed the same to its landowners within the district for irrigation purposes. Under the terms of the stay order issued by the trial court pending this appeal, the validity of which has been upheld (*Tulare Irr. Dist.* v. *Superior Court,* 197 Cal. 649 [242 Pac. 725]), the appellant has been permitted to pump from the rancho each year the quantity of water provided for in the stay order, subject to the conditions therein imposed.

The trial court found that the pumping by defendant of any portion of the waters underlying the rancho and the transportion of such waters away from the delta has injured the respondents and that each of the respondents, if such pumping continues, will be deprived of the benefit of the waters for a portion of each year for the purposes that the respondents are entitled to use the water. The trial court also found that not only will defendant's pumping diminish the underground water supply but, by induced seepage, will also diminish the surface flow of the Lower Kaweah and the St. Johns Rivers.

Some word should now be said of each class of respondent. The Tulare Irrigation District, and fifteen other of the plaintiff corporations, have rights as appropriators below McKay Point, some from the St. Johns and some from the Lower Kaweah River, and some from both. These respondents have exercised their rights of appropriation for many years prior to the commencement of this action. Their rights admittedly long antedate any right of defendant to appropriate water. In fixing the appropriative right of each respondent appropriator, the trial court divided the year into two six-month periods—period No. 1 from February

1st to July 31st, and period No. 2 from August 1st to January 31st. In fixing the appropriative right of each of the respondent appropriators in each of these periods, the trial court did not award a specific quantity of water but used as its unit of measure cubic feet per second, that is, rate of flow. The total of the appropriations found to be possessed by all of the respondent appropriators for the first period is 2,000 cubic feet per second and, for the second period, 1,000 cubic feet per second.

The second group of respondents consists of the riparian owners along both rivers and their branches. The trial court found that the lands of these riparian owners are agricultural in character and require a *reasonable* quantity of the waters of the stream to which they are riparian for irrigation purposes and the *whole of the underground* flow to moisten their lands from beneath. The trial court did not fix the amount in quantity or rate of flow reasonably required by the respective riparians for irrigation or other beneficial purposes.

In addition to the original riparian plaintiffs, a group of riparian owners also came into the case by way of intervention, the complaint in intervention being filed in 1920. Appellant has settled its differences with some of the riparians, and particularly with the interveners, pending this appeal.

The third group of respondents consists of overlying landowners. With the exception of two of this group—Morphew and Thomas Jacob—the lands of these parties are situated in the Lower Kaweah delta, west of the Venice hills. The trial court found that the water underlying the lands of these parties (other than the Jacobs) does not extend under the Rancho de Kaweah and expressly found that the water underlying the rancho and the lands of these respondents did not constitute a common supply. Pending this appeal, the appellant has entered into an agreement with one of the principal overlying owners, the Mineral King Fruit Company, the exact nature of which will be discussed later. The overlying lands of Morphew and Thomas Jacob are situate in the basin. The trial court found that the waters underlying the Jacobs' lands and the waters underlying the Rancho de Kaweah constitute a common source of supply. Apparently, however, no relief was granted the Jacobs by

reason of their ownership of overlying lands. The Jacobs, as are several other overlying respondents, are also riparian owners, and apparently the relief granted them was in their capacity as riparians.

Some reference should now be made to the pleadings and the issues framed thereby. The complaint describes in detail the Kaweah River and the delta built up by the water discharged therefrom; alleges that the Kaweah River during the late spring and early summer months carries more water than it does earlier and later in the year (admitted by defendant in its answer); that there are times in the year when the Lower Kaweah River has no surface flow below the head of Mill Creek and the St. Johns River has no surface flow below the head of Lane Slough (admitted); that certain of the creeks and sloughs leading from the lower Kaweah and St. Johns Rivers were cut out during extremely wet years by the waters of these rivers and that during every year, except extremely dry years, these designated creeks and sloughs have carried surface as well as a portion of the underground flow of the rivers (denied); that by means of the surface and underground flows of these channels the waters of the rivers have been naturally deposited and distributed upon the delta (denied), resulting in the nourishment of agricultural crops on many hundreds of farms on the delta; that the farmers on the delta require all of the waters of the river, both surface and underground, for the irrigation thereof, and for the moistening of said farms from below by means of the underground flow thereof, and for watering livestock, and for domestic and other beneficial uses (denied, appellant alleging that there is a huge surplus of water); that at all times during the irrigation season the underground flow of the rivers is necessary to furnish a foundation for the surface waters flowing in the channels and to hold up the underground water table beneath the surface of the lands, in order to make the same productive (denied); that any lowering of the water table during such time will diminish the productive qualities of the land and will also diminish the surface flow of the two rivers (denied); that plaintiffs for many years have used and require the use of the whole of said underground flow, including flood waters, for the above purposes and to replenish the underground strata (denied). It should be here added

that by the above allegations the plaintiffs collectively claim every drop of surface or underground or diffused percolating water in the delta. Following the above allegations, the plaintiffs next allege the rights claimed by each plaintiff appropriator, each claim being set forth in rate of flow, that is, in cubic feet of water per second. The riparian plaintiffs then describe their property and allege that each of them is entitled to the entire flow of the stream against any diminution by the defendant. The overlying plaintiffs allege that their lands are agricultural in character and require all of the underground waters for the purposes above described.

The complaint then alleges that prior to the commencement of the action defendant had bored three wells on the Rancho de Kaweah, thus tapping the underground waters of the delta, and that it threatens to drill 37 more wells and to pump therefrom a large quantity of water, and to transport and convey the same to the lands within its borders; that such pumping will diminish not only the underground supply, but also, by induced seepage, will diminish the surface flow of the two rivers. The prayer of the complaint is that the court decree that the defendant has no right as against the plaintiffs to divert any of the water underlying the rancho to its lands, and to enjoin the defendant from so diverting the water.

The defendant's second amended and engrossed answer denies the major allegations of the complaint, as above indicated, and also sets forth certain affirmative defenses. The main purport of the denials is to place in issue the principal question as to whether there is in the Kaweah River and in the waters underlying the delta a surplus subject to appropriation. Defendant admits its ownership of the Rancho de Kaweah and the boring of 37 wells thereon, and that starting in 1918 it had pumped therefrom and conveyed to its lands each year a designated quantity of water averaging about 14,000 acre feet per annum; alleges that this has not and will not injure any of the plaintiffs; that defendant can pump each year during the irrigation season up to 25,000 acre feet and convey the same to its lands, without injury to any of the plaintiffs; denies that the pumping has diminished or will diminish the surface flow of the St. Johns River; denies that such pumping has diminished or will substantially diminish the underground waters; denies that its

pumping has affected or will affect the early surface flow of the Kaweah River; denies that its pumping has diminished or will "diminish the late surface flow of the Kaweah River in an amount at any time in excess of ten cubic feet of water per second; or in an average amount in excess of six cubic feet per second"; denies that such taking will injure any of the plaintiffs. Defendant also alleges that it is the owner of the Enlow Ditch, leading out of the St. Johns River, and is entitled to divert four cubic feet of water per second therefrom for use on the rancho; alleges that this right is prior to any right of any of the plaintiffs.

As a separate defense against the riparian owners, defendant sought to condemn, under section 534 of the Code of Civil Procedure, all rights of the riparians above their actual needs for beneficial purposes. In this defense, it is alleged that the defendant is an irrigation district; that defendant has expended $1,600,000 for the installation of its irrigation system; that, during each irrigation season, defendant district needs the water and has no other available supply; that it proposes to take 25,000 acre feet annually at the maximum rate of 75 cubic feet per second, from the waters underlying the Rancho de Kaweah and transport the same for use on lands within the district; that defendant can take that amount of water without interfering with the actual and necessary beneficial uses of the riparian owners; that defendant desires that the court shall fix the damages, if any, that will result to the riparians by reason of such taking.

In response to this plea, the plaintiff riparians applied to the trial court for an order bringing in additional parties, alleging that their presence was necessary for the determination of the question as to whether or not there was a surplus of water supplied by the Kaweah River in excess of that required to serve the beneficial uses or purposes of the riparian owners. In 1920 and again in 1923, the trial court, in response to this request, made its order bringing into the case as new parties a large number of persons and corporations. These persons and corporations filed their respective statements of rights denying the material allegations in defendant's defense and particularly denying the existence of a surplus over their beneficial needs.

As a second defense, defendant pleaded in its answer that in the event the court shall find that the pumping operations of defendant will diminish the surface flow of the Lower Kaweah River so as to deprive any of the plaintiffs of the water to which they are entitled, then defendant is ready, able and willing, and it is possible and practicable for it, to construct and maintain a channel with impervious bottoms and sides whereby a portion of the flow of the Lower Kaweah River may be transported across the cone of depression caused by defendant's pumping during certain periods of the year.

The prayer of the answer is that the plaintiffs take nothing by the action; that the court decree that the defendant has the right to divert four cubic feet per second from the St. Johns River by means of the Enlow Ditch; that the court fix the damages, if any, that will result to the riparian owners, as provided in section 534 of the Code of Civil Procedure, and that, upon the payment of such damages, if any, a final order of condemnation be made; and that defendant have judgment that it be entitled to take the quantity of water it claims, and for other and further relief.

Later, in June, 1923, defendant, after leave of court had been obtained, filed a supplemental answer, setting up an additional defense, based on section 11 of the Water Commission Act. That act had been passed in 1913 and section 11 thereof provides that ten years nonuse of the riparian right shall constitute an abandonment thereof. This defense was aimed solely at the riparian owners. After alleging the passage and date of the passage of the Water Commission Act, and particularly section 11 thereof, it is therein alleged that the plaintiffs W. L. Fisher, Thomas Jacob, Morphew Jacob, William Epp, Henry Bente, G. W. King, Frank J. Brundage, W. W. Hicks, Walter Rouse, Visalia Orchard Company and Mineral King Fruit Company have not diverted for beneficial purposes any portion of the waters of the streams to which their respective holdings are riparian for use upon their riparian lands for ten consecutive years from and after the passage of the Water Commission Act. It is also alleged that, with the exception of Walter Rouse, all of the other named riparians have rights in plaintiff ditches sufficient for their reasonable needs; that all of the riparian plaintiffs and all of the riparians brought in by

order of court pursuant to the provisions of section 534 of the Code of Civil Procedure have lost and abandoned their riparian right by virtue of ten years nonuse of such right.

In 1920 the defendant filed a cross-complaint against two of the plaintiffs—the Consolidated Peoples Ditch Company and the Elk Bayou Ditch Company—alleging that the Rancho de Kaweah is riparian to the Lower Kaweah River; that these two cross-defendants were diverting water therefrom upstream from the Rancho de Kaweah 353 cubic feet per second in excess of their right, and prayed for an injunction. These cross-defendants subsequently answered, specifically denying the material allegations of the cross-complaint.

In October of 1920, certain parties secured leave of court to file, and subsequently filed, a complaint in intervention. These parties are H. E. Wright, S. E. Railsback, Gilbert H. Russell, Gordon Hall, James K. Moffitt, John E. Hooper, Willys Hall, George A. Smith, Nellie M. Smith and Alice C. Hall. The complaint in intervention sets forth the riparian character of the lands of these parties and thereafter follows generally the allegations of the complaint. Defendant answered the complaint in intervention by allegations similar to those contained in the second amended and engrossed answer, above analyzed, and, in addition thereto, alleged as against these parties that they were not entitled to an injunction because of the intervention of a public use. In 1923, defendant filed a supplemental answer to the complaint in intervention, based on section 11 of the Water Commission Act, alleging therein that these interveners had lost their riparian right because of ten consecutive years of nonuse.

Brief reference should be made to one other pleading. Respondent Marietta R. Gray became a party to the action by order of court made under section 534 of the Code of Civil Procedure. In place of the ''Statement of Rights'' provided for in that section, she filed a pleading entitled ''Complaint and Reply of Marietta R. Gray''. This pleading need not be analyzed for the reason that defendant has settled its differences with this party, pending this appeal, as will hereafter appear. Sufficient it is to say that she claims as a riparian to Outside Creek, alleged to be a natural watercourse and a tributary of the Lower Kaweah River.

Defendant denied the material allegations of this pleading and, in addition, alleged the intervention of a public use as against this party.

Without going into further detail, the issues presented by these many pleadings may be summarized as follows:

1. Whether there is a surplus of water in the delta from which the defendant can pump 25,000 acre feet annually, or any other lesser amount, without injury to the prior rights of the plaintiff appropriators. A solution of this issue depends upon a determination of the quantity of water actually diverted by the plaintiff appropriators prior to 1916, and whether such amount so diverted was reasonably necessary for beneficial purposes. The main contention of appellant in this regard is that respondent appropriators have never diverted the amount found by the trial court, and that, even as to the amount actually diverted, the methods of use and methods of diversion employed by respondent appropriators are and have been wasteful. It is further contended by appellant that it is not necessary for any appropriator to divert any quantity of water at all during the winter season.

2. Whether appellant's pumping operations on the Rancho affect in any amount the surface flow of the St. Johns River, and whether such pumping affects the early seasonal flow of the Lower Kaweah River at any time when the respondents have any use for the same.

3. Assuming, however, that appellant's pumping does diminish the flow of the Lower Kaweah River during periods of need by respondents, then the issue was presented as to the feasibility of constructing an impervious bypass across the cone of depression created by the pumping.

4. Whether the reasonable needs of all the lands owned by the riparians, whether plaintiffs, interveners or parties brought in under section 534 of the Code of Civil Procedure, are less than the flow of the two rivers and their tributaries. Assuming that there is an excess over the reasonable needs of all riparians, then the question is presented as to whether or not appellant is entitled to have any rights the riparians may have over such reasonable needs condemned under section 534 of the Code of Civil Procedure, or some other form of condemnation. There is also presented, in reference to the riparian parties, the question as to whether they, or any

of them, have lost their riparian rights by reason of ten years' nonuse under section 11 of the Water Commission Act.

5. Whether the interveners and Marietta R. Gray are estopped to claim the relief sought by reason of the intervention of a public use.

On the issues thus framed, the trial started on April 28, 1921, and was completed July 31, 1923. In April of 1924, the trial court rendered what appellant describes as a "memorandum opinion", not contained in the record on appeal, but mentioned here simply for purposes of continuity. As summarized by appellant, the trial court stated that in its opinion the water gathering area of the Kaweah River, supplemented by the rainfall of the valley territories, affords sufficient water in annual quantities for the uses of both plaintiffs and defendant, except in dry years, but it, the trial court, had been unable to discover any plan whereby a portion of this water might be made available to defendant and that, therefore, plaintiffs and interveners were entitled to a perpetual injunction prohibiting the defendant from pumping any water from the waters underlying the Rancho de Kaweah or from the surface waters of the Kaweah River (except the extraordinary flood waters) for transportation to and use upon the lands within defendant district. Contemporaneously with the entering of the judgment, the trial court made and entered its order suspending the operation of the injunction, subject to conditions, pending appeal. After its motion for a new trial had been denied, defendant perfected this appeal under the provisions of section 953a of the Code of Civil Procedure.

On this appeal, appellant specifies some 75 findings as being unsupported by the evidence; specifies four particulars in which the judgment is alleged to be against the law; and specifies 7 other alleged errors in the judgment.

Before discussing the merits of the appeal, some mention must be made of certain compromises effected pending the appeal. On February 19, 1931, there was filed in this court a stipulation entitled "Stipulation for Modification of Judgment" by and between certain of the respondent interveners and appellant. The respondent interveners named therein are H. E. Wright, S. E. Railsback, Gilbert H. Russell, Gordon Hall, James K. Moffitt, Joseph G. Hooper, Willys Hall,

George A. Smith, Nellie N. Smith and Alice C. Hall, and constitute the entire group of interveners represented by H. Scott Jacobs, as attorney. These parties claim as owners of approximately 12,000 acres of land in Kings County, found by the trial court to be riparian to Cross Creek, the continuation of the St. Johns River. The above-named parties constitute all of the interveners in the action, unless respondent Marietta R. Gray also be considered one of that group. Without recounting all the terms of the stipulation, it is therein stated that "the controversy between said Interveners and Respondents and said Defendant and Appellant has been fully settled, compromised and adjusted by agreement between said parties". The stipulation then recites the entering of the present judgment and the fact that an appeal is pending, and then recites that it is agreed that the judgment may be modified by adding certain provisions to paragraphs X and XIV of the judgment and by eliminating paragraph XX therefrom. The modifications thus provided for are to the effect that as against the named respondents appellant is entitled to divert and transport away from the Kaweah or St. Johns Rivers, or any of their branches, or from the waters underlying the Rancho de Kaweah or the Kaweah delta, at such times and at such a rate as it may desire, a quantity of water in each year equal to the amount that would be produced by a continuous flow of 35 cubic feet of water per second during the year (approximately 25,500 acre feet). The exact terms of the modification will appear in the final order of this court on this appeal.

On April 7, 1931, there was filed in this court a "Notice of Motion to Reverse Judgment in favor of Respondent, Mineral King Fruit Company". The fruit company is one of the riparian and overlying owners. The motion is based on an agreement entered into on September 2, 1930, between the fruit company and appellant. Counsel for this company have made no written objection to the granting of the motion, but during the oral argument objected solely on the grounds that they had not been consulted by their client before the agreement was made, the agreement having been entered into by the officers of their client; that their last instructions from their client were to prosecute the appeal; that they had been unable to get in touch with their client in the two days intervening between

service of the motion and the oral argument; that they did not know their client's desires in the matter. The motion was then taken under submission, to be determined with the appeal on the merits, counsel being informed that they could make any objection they saw fit to the granting of the motion. Since the oral argument, counsel for respondents have filed two briefs in this case and in neither of them is any objection made to the granting of the motion. It appears, therefore, that all objections thereto have been removed.

The agreement first recites that the fruit company has sold to one Huebert certain described shares of stock, and that Huebert, in purchasing the stock, was acting as agent of appellant; that as part of the consideration for the purchase of the stock the fruit company agreed to execute the present agreement; that the fruit company is a plaintiff in this action, claiming as a riparian and overlying owner, and is also plaintiff in another described action. In consideration of the purchase from it of the stock, the fruit company agrees "that it will and it hereby does waive, surrender and release any claim that it may now or hereafter have as owner of said lands against said Lindsay-Strathmore Irrigation District for injunction or other relief, by reason of the pumping of water by said irrigation district from the lands owned or occupied by said district or the transportation of said water to the lands embraced within said district or the use of such water thereon, or by reason of any diversion by said irrigation district of any of the waters of said Kaweah River, said St. Johns River, or said Mill Creek, for use upon the lands embraced within the said irrigation district, and particularly any claim to which the said party of the first part (the fruit company) may now or hereafter have, by reason of any judgment or order made or hereafter made in either of said actions above referred to, and said party of the first part further agrees that upon the written request of the party of the second part (appellant) it will take such steps as may be necessary to cause judgment of dismissal in favor of said district in each of said actions to be entered of record in the said proceedings so far as the rights of said party of the first part are concerned . . . " From these provisions it is obvious that the controversy between the fruit company and appellant has been finally settled and that, as to these parties, all questions on this appeal have

now become moot. The motion should, therefore, be granted and the judgment reversed as to the Mineral King Fruit Company, with instructions to the trial court to dismiss the action with prejudice to this party.

On July 1, 1932, there was filed in this court another document entitled "Stipulation for Modification of Judgment", this time affecting the rights of respondent Marietta R. Gray, another riparian and overlying party. The terms of this stipulation are almost identical with the one above discussed affecting the rights of the interveners. The terms of this stipulation will be set forth in the order of this court at the end of this opinion.

As a result of these compromises and stipulations, there is removed from the necessity of consideration the claims of a considerable number of riparian and overlying owners. However, the rights of all riparian and overlying owners have not been settled, so that the claims of those remaining must be disposed of. For purposes of convenience, the rights of the riparian and overlying respondents will be considered in this opinion before the rights of the respondent appropriators are considered.

In reference to the riparian lands, the trial court found that upon such lands, for many years, the owners thereof have grown crops of natural grasses and other feed products, also alfalfa, grain, and fruit trees, and other agricultural products for commercial purposes; "that the said lands are agricultural in character and require and have required *a reasonable quantity of the waters* of the stream to which said lands are riparian, respectively, for the irrigation thereof, and the *whole of the underground flow* of said stream and of the Kaweah river to moisten the said land from beneath and to render it productive and to enable the owner thereof to raise such crops as he raises and is and has been accustomed to raise thereon, and for livestock to drink and for domestic and other useful and beneficial purposes to which said land is now and at all times herein mentioned and for many years last past has been devoted; that each of said riparian owners has a prior, superior and paramount right as against said defendant, *to the entire natural flow of such stream* to which the lands of such owner are riparian as aforesaid, *as against any diminution thereof by the said defendant,* except as the said Kaweah River below said McKay Point may be diminished by the

riparian uses of said defendant upon its riparian lands on the said Rancho de Kaweah''; that the riparian plaintiffs do not obtain water for irrigation purposes from the canals or ditches of the plaintiff ditch companies; that it is true ''that the natural flow of the stream or streams to which the lands of the plaintiffs who are riparian owners . . . as herein found, has, in each and every year since prior to the commencement of this action naturally irrigated said riparian lands and moistened the ground therein to a great and unknown extent, and thus stimulated vegetation thereon, and added to the fertility thereof, and does now naturally irrigate the same and so moisten the ground therein, and stimulate the vegetation thereon and add to the fertility thereof; and said natural flow has been and is beneficial to all of said riparian lands and to the owners thereof''; that the pumping by defendant diminishes the surface flow of both the St. Johns and Lower Kaweah Rivers.

As to the overlying owners, the court found that the lands of the plaintiffs ''upon which water has been and is *now being pumped from underground sources of supply''* (overlying lands) are agricultural in character, upon which the owners have for many years grown agricultural crops; that underneath the surface of the delta west of the gaps in the Venice hills there is ''an underground body of diffused percolating water *which does not form a part of the surface or underflow of said Kaweah River or the branches thereof,* and extends downward from a few feet of the ground surface to a great depth and many miles in width, moving generally with the surface slope and at right angles to the surface contours of said Delta, at various depths beneath the surface of the said Delta; that said *underground body of water does not constitute a portion of the underflow of any river or stream.* . . . Through the lower [Kaweah] Delta it extends downward to great depth and is drawn upon extensively by pumps for use on overlying lands. It is prevented from percolating off the Delta by impervious and tight soils of great depth, extending along the outward limits of the Delta; that from a period prior to the year 1918, and ever since said year, the underground water table within the major portion of the low Kaweah Delta has been and is falling; that the amount of lowering of said water table has been sufficient to increase substantially the cost and difficulty of pumping water therefrom for use on

overlying lands; . . . that said underground body of water . . . is constantly supplied by waters sinking from the Kaweah River and its branches, and below said gaps from the underflow moving out of said basin through said gaps, and by seepage from the canals and ditches, and by the water escaping downward from the irrigation waters applied to the surface of the lands within said Delta, and to a very limited extent from small creeks draining into the Delta and from rainfall upon the Delta''; that the body of underground percolating water underlies the entire surface of the Lower Kaweah Delta; ''that any lowering of said water table to a depth below the reach of normal root growth of crops, except annual shallow rooted crops, or any substantial lessening of the underground flow during any time, will greatly diminish the productive qualities of said lands and diminish the quantity and quality of the crops grown thereon''; that the underground body of water when high serves to keep the surface and underflow of the river from percolating into the surrounding area, and that the higher the percolating underground water table the longer will the streams flow and the greater the quantity of water in them; that the plaintiffs do not require all of the underground body of percolating water for beneficial uses; that the overlying owners do draw upon the underground body of water for beneficial uses; that it is not true ''that said plaintiffs and interveners have used or require the use of all or any substantial portion of the extraordinary flood waters of said river to replenish the said underground flow or to supply the underground strata of said Delta below said gaps''; that ''*it is not true* that each of said [overlying] lands, or any of said owners, except the said plaintiffs Thomas Jacob and Morphew Jacob, requires the whole of the underflow of said Kaweah River underneath the said lands upon which such owner has obtained water by means of pumps, for said purposes to supply water to such owner through or by means of such wells and pumping plants for his livestock to drink and for the irrigation of his said lands'' and for domestic and other beneficial purposes; that Thomas Jacob and Morphew Jacob have upon their lands a well and pumping plant, by means of which, prior to and since the commencement of this action, they have pumped a quantity of water from the underground body of water underlying their lands for beneficial purposes; that said

"underground supply is a portion of the underground flow of said Kaweah River . . . and constitutes a common supply for said lands . . . and the said Rancho de Kaweah"; that the lands of other overlying plaintiffs in the Lower Kaweah delta do not overlie the same source of supply as that underlying the rancho; that defendant's pumping operations have substantially diminished the quantity of water underlying the basin and have substantially diminished the surface flow of the rivers and their branches, thus diminishing the quantity available to the riparians; that the pumping operations of defendant induce seepage from both rivers, causing a loss in the surface flow of both streams; that the pumping of water from the rancho and the conveying of the same away from the basin in the amounts pumped during the pendency of the action "has diminished, and will, if continued in the future, diminish the late surface flow of the Lower Kaweah River in amounts at all times in excess of ten cubic feet of water per second, and in an average amount in excess of six cubic feet per second, and that the amount of said diminution has varied during said pumping operations from day to day and season to season, and that said operations of defendant on various occasions and for many days diminished the late surface flow of the Lower Kaweah River to an extent in excess of forty (40) cubic feet of water per second".

The above summary of the findings applicable to the riparian and overlying owners is not intended to be inclusive, but is here given to indicate the general trend of the findings. It is to be noticed that the trial court made no attempt to fix either in acre feet or in second feet the quantity of surface water to which the riparian owners are entitled, being content to find that such owners were entitled to "a reasonable quantity of the waters of the stream". As to the underground flow of the streams, as distinguished from the underground diffused percolating waters, the trial court found that such riparians were entitled to the "whole of the underground flow of said stream". The trial court concluded that each of the riparian owners "has a prior superior and paramount right as against said defendant to the entire natural flow of such stream . . . as against any diminution thereof by the said defendant", except for riparian uses. It is quite apparent from a reading of the findings and the judgment predicated

thereon that the trial court applied the rule that a riparian as against an appropriator, whose right has not ripened into a right by prescription, is entitled to the full flow of the stream as it is wont to flow in a state of nature, without diminution by the appropriator, and that any interference with that right is an infringement of a vested property right. Stated another way, the trial court held that as between such parties the riparian and overlying owners are not limited to a reasonable beneficial use. This was the law at the time the judgment herein was entered. (*Miller & Lux v. Madera etc. Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391; *Miller v. Bay Cities Water Co.*, 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772].) See, also, *Herminghaus v. Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607]; *Fall River Irr. Dist. v. Mt. Shasta Power Corp.*, 202 Cal. 56 [259 Pac. 444, 56 A. L. R. 264], rendered subsequent to the entering of judgment herein, but expounding the principles of law then existing. Since the trial of this case the people of this state in the exercise of the police power and by constitutional amendment, have changed the rule enunciated in these cases. Section 3 of article XIV of the Constitution became effective in November of 1928. The effect of this amendment has been to modify the long-standing riparian doctrine announced in the above cases, and the cases cited therein, and to apply, by constitutional mandate the doctrine of reasonable use between riparian owners and appropriators, and between overlying owners and appropriators. The effect of that amendment has been so recently before this court, and has been so fully discussed in the case of *Peabody v. City of Vallejo*, 2 Cal. (2d) 351 [40 Pac. (2d) 486], that no useful purpose would be served by repeating in this opinion what was there said. (See, also, *Gin S. Chow v. City of Santa Barbara*, 217 Cal. 673 [22 Pac. (2d) 5].) ■ Under this new doctrine, it is clear that when a riparian or overlying owner brings an action against an appropriator, it is no longer sufficient to find that the plaintiffs in such action are riparian or overlying owners, and, on the basis of such finding, issue the injunction. It is now necessary for the trial court to determine whether such owners, considering all the needs of those in the particular water field, are putting the waters to any reasonable beneficial uses, giving consideration to all factors involved, including reasonable

methods of use and reasonable methods of diversion. From a consideration of such uses, the trial court must then determine whether there is a surplus in the water field subject to appropriation. ■ If the riparian is putting the water to any reasonable beneficial uses, it is now necessary for the trial court to find expressly the quantity so required and so used. A finding, such as that in the present case to the effect that the riparian requires a "reasonable" amount for such uses, under the new doctrine, is clearly insufficient and a judgment based thereon must be reversed. The trial court, under the new doctrine, must fix the quantity required by each riparian for his actual reasonable beneficial uses, the same as it would do in the case of an appropriator. ■ The new doctrine not only protects the actual reasonable beneficial uses of the riparian but also the prospective reasonable beneficial uses of the riparian. As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises. Therefore, as to such uses, the trial court, in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator. By such declaratory judgment, the rights of the riparian will be fully protected against the appropriative use ripening into a right by prescription, but, until the riparian needs the water, the appropriator may use it, thus, at all times, putting all of the available water to beneficial uses. ■ The trial court might well, by appropriate provisions in its judgment, retain jurisdiction over the cause, so that when a riparian claims the need for water, the right to which was awarded him under such a declaratory decree, the trial court may determine whether the proposed new use, under all the circumstances, is a reasonable beneficial use and, if so, the quantity required for such use.

■ It is to be noted that the new doctrine embodied in the constitutional amendment, as interpreted in the Peabody case, not only applies the doctrine of reasonable use as between riparian and appropriator, but also as between an overlying owner and an appropriator. The overlying owner in this state has been held to have analogous rights to those of a riparian. (*Katz* v. *Walkinshaw*, 141 Cal. 116, 70 Pac. 663 [74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236]; *Burr* v. *Maclay Rancho Co.*, 154 Cal. 428 [98 Pac. 260].)

Such overlying owner is now subject to the same restrictions as those applicable to riparian owners. The doctrine of *Miller* v. *Bay Cities Water Co., supra,* in so far as it held, or has been interpreted to hold, to the contrary was specifically repudiated in the Peabody case, *supra.*

 From the above analysis, it follows that if the 1928 constitutional amendment is applicable to this appeal, although passed after the appeal herein was perfected, the judgment in favor of the remaining riparian and overlying owners must be reversed, with instructions to the trial court to fix such respondents' rights in accordance with the law as it now has been fixed by constitutional mandate. As already pointed out, the finding that the riparians require a "reasonable" amount of the surface flow of the stream is clearly insufficient under the new doctrine. Equally insufficient under the new doctrine, and for the same reasons, is that finding that "each of said riparian owners has a prior, superior and paramount right as against said defendant to the entire natural flow of such stream . . . as against any diminution thereof by the said defendant". This finding in the absence of a finding as to what the needs of each riparian are cannot be supported. The further finding that each riparian requires the "whole of the underground flow of said stream . . . to moisten said land from beneath", etc., is not sufficient under the new doctrine. The use of the entire flow of a stream, surface or underground, for subirrigation cannot be held to be a reasonable use of water in an area of such need as the Kaweah delta. (*Peabody* v. *City of Vallejo, supra.*)

 We now pass to a determination of the question as to whether the constitutional amendment of 1928 is applicable to the present appeal. The problem here presented differs radically from that presented in the Peabody case, *supra.* That case, as is stated in the opinion, was not decided by the trial court until June of 1929, the constitutional amendment having become effective in November of 1928. The holding in that case that the trial court must decide the cause in accordance with the law existing when the judgment was entered is not decisive here. In the present case, the action had been tried, judgment entered, and the appeal perfected before the constitutional amendment was passed. We are, therefore, directly presented with the question as to whether, in this

case, the law in existence at the time of the judgment or the law in existence at the time the appellate court decides the case should prevail.

The effect, on an appealed case, of a change in the law pending the appeal, has given rise to many diverse and some conflicting decisions. Aside from questions presented when rights are vested in reliance on the lower court's decision, and aside from questions presented where the new statute expressly states whether it is or is not to apply retrospectively, questions which are not here presented, on the main question as to whether the cause should be disposed of according to the law in effect at the time judgment was rendered, or to the law in effect at the time the cause is disposed of on appeal, there is a sharp diversion of authority. (4 Cor. Jur., p. 1119, sec. 3109; see, also, Cooley, Constitutional Limitations, 8th ed., vol. 2, p. 790.) California, apparently, has cases both ways. In *Hancock* v. *Thom*, 46 Cal. 43, and in *D. I. Nofziger Lumber Co.* v. *Waters*, 10 Cal. App. 89 [101 Pac. 38], without adequate discussion, it was held that the law in effect at the time the judgment was rendered by the lower court was controlling, while in *First National Bank* v. *Henderson*, 101 Cal. 307 [35 Pac. 899], it was held that the appellate court must dispose of the case in accordance with the law existing at the time of its own decision. (See, also, 2 Cal. Jur., p. 806, sec. 474; 2 Cal. Jur., p. 972, sec. 572.) Whether these cases are in conflict or can be reconciled, and what the better rule may be in cases of appeals generally need not now be decided. In the class of appeal here presented, there should be and there is no question. The present action involves an appeal from an injunction decree, which, by its very nature, acts on the rights of these parties in the future. The very nature of the proceeding was to settle for all time the rights of these parties to the waters of the Kaweah delta. It would be an idle gesture to affirm this judgment in favor of the riparian respondents, because correct when rendered, with full knowledge that it is incorrect under existing law, and with full knowledge that, under existing law, the decree as rendered settles nothing so far as the future rights of these parties are concerned. For this reason, whatever may be the law applicable to appeals generally, the rule is well settled that on appeals involving injunction decrees, the law in effect when the

appellate court renders its opinion must be applied. In *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184 [42 Sup. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360], the plaintiff had secured an injunction in a labor dispute. Pending the appeal, a statute was passed materially restricting the use of the injunction in such cases. The United States Supreme Court, Chief Justice Taft writing the opinion, held that the appeal must be determined under the new statute. At page 201, it is stated:

"The first question in the case is whether section 20 of the Clayton Act . . .. is to be applied in this case. The act was passed while this case was pending in the Circuit Court of Appeals. In *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 464 [41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196], a suit to restrain a secondary boycott had been brought before the passage of the act, but did not come to hearing until after its passage. It was held that, because relief by injunction operates *in futuro* and the right to it must be determined as of the time of the hearing, section 20 of the act, relating to injunctions, was controlling in so far that decrees entered after its passage should conform to its provisions. [The Deering case referred to involved the same question that was presented in the Peabody case, *supra.*] The .decree here appealed from in the District Court had been entered before the Clayton Act passed. But the whole cause was taken up by the appeal. The complainant had no vested right in the decree of the District Court while it was subject to review . .·. The Circuit Court of Appeals was called upon to approve or to change the decree and was obliged, therefore, to regard the new statute in its conclusion, and so are we." The same conclusion was reached by the same court in *Texas Company* v. *Brown,* 258·U. S. 466 [42 Sup. Ct. 375, 66 L. Ed. 721]. In that case, after an interlocutory decree had been entered, and pending the appeal, the state legislature, apparently in view of the very controversy involved in the case, amended the law under which the decree had been entered. The court held that the appeal must be determined in accordance with the amended statute, stating (p. 474):

"Although passed after the decree below, this act must be given effect in deciding the appeal, since the case involves only relief by injunction, and this operates wholly *in futuro.*"

■ The only argument made by respondents on this point is that neither the legislature, by statute, nor the people, by constitutional amendment, has the power to abridge, modify, destroy, reduce or limit the vested riparian right, and that if the 1928 constitutional amendment is intended to reach this result, it deprives respondents of their property without due process of law and deprives them of the equal protection of the law in violation of the federal Constitution. These arguments are completely answered by the reasoning found in the Gin Chow and Peabody cases, *supra*. Both of these cases hold that the amendment in question was passed under and by virtue of a reasonable exercise of the police power, and, as such, constitutes a lawful abridgment of the riparian right.

■ That the protection and conservation of the natural resources of the state are in the general welfare and serve a public purpose, and so constitute a reasonable exercise of the police power, is now so well settled that no further citation of authority is necessary. It, therefore, follows that no provision of the federal Constitution has been violated. As was said in the Peabody case, page 366 [2 Cal. (2d)]:

"In further clarifying the new state policy, we have no hesitancy in doing so without fear of infringing upon any provision of the Federal Constitution. The attitude of the Supreme Court of the United States has been consistent in leaving the question of private water rights, which do not involve federal or interstate interests, to the control of local state policies. (*United States* v. *Rio Grande Irr. Co.,* 174 U. S. 690, 702, 703 [19 Sup. Ct. 770, 43 L. Ed. 1136]; *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 356 [28 Sup. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560]; *State of Connecticut* v. *Commonwealth of Massachusetts,* 282 U. S. 660, 670 [51 Sup. Ct. 286, 75 L. Ed. 602].)"

■ We, therefore, hold that the 1928 constitutional amendment is applicable to this case, and, for that reason and reasons already discussed, the judgment, in so far as it affects the various riparian and overlying respondents, whose rights have not been settled by compromise, or whose rights are not hereinafter determined, must be reversed, with instructions to the trial court to take evidence, and to find the quantity of water necessary for the reasonable beneficial uses of such respondents, and by proper judgment

protect such respondents in that quantity; further, that the trial court, in accordance with the mandate in the constitutional provision, should incorporate in its decree a declaration protecting such respondents in the prospective reasonable beneficial uses of the waters here involved, unless such prospective right be condemned in accordance with the principles hereinafter set forth. On such retrial, it should not be necessary for these respondents to prove the riparian nature of their respective properties, the evidence being ample to support the findings and judgment in respect thereto, and those portions of the judgment will, therefore, be affirmed.

There are several other matters in reference to the riparian owners which must be discussed. It will be re- remembered that in its supplemental answer, filed over ten years after the passage of the Water Commission Act, defendant pleaded as a special defense aimed at certain of the riparian plaintiffs, the provisions of section 11 of the Water Commission Act. The contention is that these named parties have lost their riparian right by reason of ten years' nonuse thereof, the section in question specifically providing that such nonuse for such period shall constitute a conclusive presumption of abandonment, and shall subject such waters to appropriation. By subsequent pleadings, the defendant raised the same defense as to all the other riparian owners. The trial court found that four of the named riparians (W. L. Fisher, Henry Bente, G. W. King and Frank J. Brundage), had lost by such ten-year nonuse any right to divert any water from the *surface* flow of the streams, but, nevertheless, granted such four parties an injunction, evidently because it also found that all riparians, including the named four, were entitled to and used the *whole of the underflow* of the streams for sub-irrigation and to support the surface flow of the streams. For the benefit of the trial court on the retrial, it, therefore, becomes necessary to determine the legal effect of the defense predicated on section 11, and the constitutionality of that section. In so far as the section attempts to declare that ten years' nonuse, without an intervening use, shall constitute an abandonment of the riparian right, we think the section is unconstitutional. This court, on at least three occasions, at least by *dicta*, has indicated its belief that the section is unconstitutional. (*Herminghaus* v.

*Southern California Edison Co.*, 200 Cal. 81, 117 [252 Pac. 607] ; *Fall River Irrigation Dist.* v. *Mt. Shasta Power Corp.*, 202 Cal. 56, 68 [259 Pac. 444, 56 A. L. R. 264] ; *Scott* v. *Fruit Growers Supply Co.*, 202 Cal. 47, 54 [258 Pac. 1095].) More important, however, is the fact that such provision is contrary to the letter and spirit of the 1928 constitutional amendment, above discussed. That amendment, while limiting the riparian as against an appropriator, to reasonable beneficial uses, as likewise does section 11 of the Water Commission Act, expressly protects the riparian not only as to his present needs, but also as to future or prospective reasonable beneficial needs. Since this is so, it would be incongruous and in violation of the spirit of the constitutional provision to hold that ten years' nonuse, without any intervening use giving rise to a right by prescription, constitutes a complete abandonment. Moreover, the riparian right includes, of course, not only the right to the surface flow as now limited, but also to the underground flow of the stream, subject to the limitations in the 1928 constitutional amendment. In the present case, the trial court found that every riparian was putting the underground flow to beneficial uses. On the new trial, it will become necessary, under the new policy, to determine whether, in view of all the circumstances, such beneficial uses are reasonable. All defenses predicated on section 11 of the Water Commission Act are, therefore, removed from the case.

 There is another matter in reference to certain of the riparian parties that must be mentioned. As already stated, as a special defense to the riparian respondents, the defendant set forth the facts required under section 534 of the Code of Civil Procedure, for the purpose of having the court, in the event that the court should find that the riparians did not require all the waters of the streams to which their lands are riparian for their reasonable beneficial uses, determine the damages such riparians would suffer by reason of the taking of the excess over such requirements. In other words, defendant sought to condemn, under the special provisions of section 534 of the Code of Civil Procedure, whatever right the riparians may have in excess of their reasonable requirements. The plaintiffs filed their respective statements of rights, as required by section 534,

and impleaded numerous other persons and corporations on the ground that their presence was required in order properly to determine the questions presented. On December 11, 1920, the trial court made its order requiring these persons and corporations to appear in the action. In response to this order, many of those named appeared and filed statements of their rights. On April 12, 1923, another order was made bringing in additional parties. Some of these impleaded parties simply alleged that as riparians they were entitled to the full flow of the stream; others set forth the quantity of water required for their needs; others alleged they were entitled to a reasonable quantity of water without specifying the quantity; while all of the claimants alleged that they will suffer damages in various amounts, if the defendant be permitted to pump 25,000 acre feet annually from the waters underlying the rancho. The defendant duly answered these various statements of rights, which answer alleged in substance that there was a surplus over the reasonable needs of these parties and available to appropriation. None of the impleaded parties offered any evidence at all. The trial court found that it is not true that any of plaintiff riparians, or impleaded parties, has abandoned his riparian rights, except the four above mentioned. Although the court fully found the facts in reference to the bringing into the action of the impleaded parties, and although such parties are frequently referred to in the findings, apparently no specific findings determining their rights were made. In the conclusions of law, it is provided that "all proceedings in this action based upon or existing out of the reply to answer of the plaintiffs herein who are riparian owners, the statements of rights of all parties impleaded herein and the answers of defendant to such statement of rights, should be dismissed", and this provision is carried into the judgment. Of course, the court did find that, except for certain extraordinary flood waters, there was no surplus in the delta from which the defendant could take 25,000 acre feet annually, or any other fixed quantity.

Both appellant and respondents present lengthy arguments as to the constitutionality of section 534 of the Code of Civil Procedure, the respondents vigorously contending that the section is unconstitutional. We do not here find it necessary to pass upon the highly controversial and

serious question as to the constitutionality of section 534, for several reasons. In the first place, so far as the impleaded riparians are concerned, they did not become parties to this controversy until after 1920. At that time, a public use had long since attached in favor of appellant. In other words, so far as the riparians who first became parties to the action in and subsequent to, 1920 are concerned, the property involved, as against them, had already been taken by appellant and was being devoted to a public use. Under such circumstances, the proceeding became in fact an inverse condemnation suit, governed by the principles reviewed by this court in *Collier* v. *Merced Irr. Dist.*, 213 Cal. 554 [2 Pac. (2d) 790]. See, also, *Peabody* v. *City of Vallejo, supra; City of Los Angeles* v. *Pomeroy*, 124 Cal. 597 [57 Pac. 585] ; *Turner* v. *East Side Canal Co.*, 169 Cal. 652 [147 Pac. 579] ; *Newport* v. *Temescal Water Co.*, 149 Cal. 531 [87 Pac. 372, 6 L. R. A. (N. S.) 1098]. The appellant herein, therefore, had the right to have the damages, if any, of these impleaded riparians determined in this action. In fact, on the new trial, the appellant, if it be so advised, has the right to amend its answer so as to condemn the entire riparian right of these riparians, instead of just the excess over the needs of these parties, as the pleading now requests.

However, the above reasoning is not applicable to all the riparian respondents. The doctrine of inverse condemnation, as set forth in the Collier case, *supra*, can be properly applied only where a public use has attached. As to the original riparian plaintiffs, whose rights have not been compromised, such public use did not attach to the quantity actually used by them for reasonable beneficial purposes prior to the filing of this action. However, as was held in the Peabody case, and reaffirmed earlier in this opinion, the riparian as against an appropriator, has two major rights: (1) In the event a public use has not attached, and in the absence of a condemnation suit, he is entitled to an injunction to protect his prior right to the amount of water he presently needs for reasonable beneficial purposes; and (2), he is entitled to a judicial declaration of his prior right to whatever quantity he may in the future need for such uses. As to such prospective uses, however, it is obvious that when, as here, the appropriator

takes the water and devotes the same to a public use, prior to the time such prospective needs arise, a public use has intervened as to the quantity required for such future uses. The appropriator may not desire to appropriate the water and to construct large and expensive works with the possibility constantly in the offing that the riparians, who have been protected by a declaration of their rights in the water for future purposes, will increase their reasonable and beneficial use of the water, so that ultimately, perhaps, none is left for appropriation. ■■■ The appropriator may and probably would desire to condemn the riparians' right to use of the water in the stream for these prospective purposes. No good reason suggests itself why the appropriator should not be permitted to do this in the injunction suit by means of an inverse condemnation. The same compelling reasons that exist for permitting such a procedure when the entire riparian right is sought to be condemned likewise exists where the appropriator simply desires to condemn the right of the riparian to whatever additional water he may later need for prospective reasonable beneficial purposes. In both cases, the all-important fact must exist that a public use has attached, but once that is present, this procedure seems to us sensible and well calculated to prevent multiplicity of suits and interminable delays. The above principles make it unnecessary to pass upon the constitutionality of section 534 of the Code of Civil Procedure. That section attempts to provide a special type of condemnation procedure applicable only in water cases and, by its own provisions, is limited to cases where the defendant seeks to condemn the excess over the "actual and necessary beneficial uses" of the riparian. The section was undoubtedly intended to ameliorate the rule formerly prevailing that a riparian as against an appropriator was entitled to an injunction regardless of damage, but, under the new policy set forth in the 1928 constitutional amendment, the rule has been changed so that the necessity for the special procedure set forth in section 534 no longer exists. It is true that the appropriator may desire to condemn the right of the riparian to the excess over his present reasonable beneficial needs, but, as already pointed out, that result may be achieved, under well settled principles of equity, by an inverse condemnation suit, without resort to the special provisions of section 534.

■ For the guidance of the trial court on the retrial of this case, and in future cases, the rule as to the burden of proof under the new policy should be stated. In the Peabody case, *supra*, at page 381, it is stated:

"However, when one enters a field of water supply and seeks by appropriation to take water from such supply on the claim that there is more than sufficient for all reasonable beneficial uses by those who have the prior and preferential right, it would seem to comport with the principles of fairness and justice that the appropriator, whatever way the issue may arise, should have the burden of proving that such excess exists." This rule, placing the burden on the appropriator who seeks to take water from a particular water field to show that there is a surplus, does not relieve the riparians and appropriators, who are already in the field, from the burden of proving the quantity of water that they have been using, and that such amount is necessary for their reasonable beneficial purposes. The rule throws on the new appropriator the burden of proving the existence of a surplus from which it can extract the quantity it desires from either the surface or subterranean flow without injury to the uses and requirements of those who have prior rights. ■ In the present case, while it is true the burden was on appellant to prove the existence of a surplus, that burden did not come into existence until after the respondent riparians first proved the amount required by them for reasonable beneficial purposes. This primary burden the riparians did not sustain. The evidence as to the existence of a purported surplus will be discussed more fully hereafter.

■ Also, for the guidance of the trial court on the retrial, some mention should be made of appellant's contention that all the respondents, riparians and appropriators alike, are barred from securing an injunction in this case by reason of their alleged laches. This argument was not made in the trial court, but, in fact, was first made in appellant's reply brief. In the trial court and in its opening brief, appellant urged that the interveners and the impleaded parties were barred by reason of the intervention of a public use. The compromises above referred to have removed from the present case all such questions in reference to the interveners and, so far as the impleaded parties are concerned, that question has already been disposed of in

this opinion. Appellant's present point is that, although admittedly the action involved herein was seasonably brought by respondents before a public use had attached, nevertheless, all respondents are barred from securing an injunction, for the reason that respondents failed, immediately after filing the complaint, *to apply for or to obtain a preliminary injunction* to prevent the public use from attaching. Apparently respondents did not apply for a *preliminary* injunction until some time in 1921. (See *Tulare Irr. Dist.* v. *Superior Court*, 197 Cal. 649, 657 [242 Pac. 725].) At that time, of course, the water was being, and for several years had been, devoted by appellant to a public use. Appellant now argues that failure to apply for such *preliminary* injunction prior to the time the public use attached, bars all the respondents from an injunction. To state the contention is to refute it.

Preliminarily, it should be stated that the evidence in this case shows that respondents notified appellant before it (appellant) sold its bonds or let any contract for the construction of its system that it should not proceed with the proposed work and warned it not to do so; that the present action was commenced within forty days of the giving of that notice and prior to the doing of any construction work; that the action was diligently prosecuted by respondents; that the trial was in progress during the time the construction work was performed; that the appellant constantly and publicly contended that its pumping operations, as proposed, would not affect in the slightest degree or to any extent the supply of water to which respondents were entitled; that for some time after the second season's pumping had been completed appellant contended in its answer that its pumping operations would not to any extent diminish the flow of any of the surface streams of the delta; and that after the first judge who tried this case was disqualified respondents continued diligently to prosecute the action and secured then a temporary injunction. In the face of these facts appellant now urges that because of the fact that respondents did not apply for and obtain a preliminary injunction restraining appellant from proceeding, respondents are now barred from securing an injunction. This startling conclusion is arrived at by certain inferences made by appellant from the decision in the case of *Consolidated*

*Peoples Ditch Co.* v. *Foothill Ditch Co.*, 205 Cal. 54 [269 Pac. 915]. The real parties in interest in the above action were the appropriators in the present action and appellant. The conclusion is not justified by that or any other case relied on by appellant. It is arrived at only by a misapplication of the rule enunciated in the Foothill Ditch Company case. In that case the plaintiffs brought an action to enjoin the defendants from diverting water from the Kaweah River at a point above McKay Point. The Lindsay-Strathmore Irrigation District, the real defendant, sought to justify its proposed action by reason of its stock ownership in various ditch companies. After the action had been pending a few months, the plaintiffs therein applied for and the trial court granted a preliminary injunction to prevent the threatened diversion pending trial. The Lindsay-Strathmore Irrigation District appealed, and one of the technical grounds urged by it on that appeal was that no preliminary injunction should have been granted, for the reason that no water was flowing in the river when it was applied for and no restraint was necessary. In refuting this contention, this court, among other things, pointed out the extensive preparations then being made by the Lindsay-Strathmore Irrigation District to divert the water as soon as it should start flowing and then stated (p. 58):

"In the presence of such preparation the plaintiffs could not afford to remain passive until such time as the water rose in the river to a height which would render its actual diversion by these appellants possible, *without risk of the charge of laches in allowing appellants' costly outlays based upon a claim of right to proceed.*"

Based upon the italicized portion of the above quotation, appellant argues that this court must have held in that case that a preliminary injunction was proper "because, and only because, a failure to apply for such relief until the water had been actually diverted for public use would have subjected the plaintiffs in the action to the bar of laches so far as injunctive relief was concerned". (Appellant's Reply Brief, p. 290.)

Such conclusion is clearly a *non sequitur*. Obviously, all that this court meant by the above quotation was that an application for and the securing of a preliminary injunction before the diversion takes place is con-

clusive evidence that a public use has not attached and that plaintiffs have not been guilty of laches, but the absence of such a request merely subjects the plaintiff to the ''risk of the charge of laches''. Ordinarily, the filing of an action, with or without the request for a preliminary injunction, before work has commenced, will prevent a public use from attaching. (*Gurnsey* v. *Northern California Power Co.*, 160 Cal. 699 [117 Pac. 906, 36 L. R. A. (N. S.) 185]; *Miller & Lux* v. *Enterprise C. & I. Co.*, 169 Cal. 415 [147 Pac. 567]; *Newport* v. *Temescal Water Co.*, 149 Cal. 531 [87 Pac. 372, 6 L. R. A. (N. S.) 1098]; *Conaway* v. *Yolo Water & Power Co.*, 204 Cal. 125 [266 Pac. 944, 58 A. L. R. 674; *Collier* v. *Merced Irr. Dist., supra; Peabody* v. *City of Vallejo, supra*.) A case might well be imagined, however, where the mere filing of an action, without diligent prosecution thereof, might be held to be laches and estop the plaintiffs. No such state of facts is here presented. Whatever the basis of the doctrine of the intervention of a public use may be, whether it be based on estoppel or public policy (see discussion in the Peabody case, *supra,* p. 377), the facts in the present case are not sufficient to raise the doctrine as against the respondent riparians or appropriators, except as elsewhere in this opinion indicated.

We now pass to a discussion of the various points raised by appellant in reference to the judgment in favor of the plaintiff appropriators.

In reference to the appropriators, in addition to the findings above discussed, many of which are applicable both to riparians and appropriators and, therefore, need not be repeated, the trial court found that each of the corporate appropriators was entitled to a certain amount of water measured by rate of flow, that is, measured by cubic feet per second. In fixing the award to each respondent appropriator, the court, as already mentioned, divided the year into two six months periods. Period No. 1 covered the period from February 1st to July 31st, and period No. 2 from August 1st to January 31st. In every case the amount of the award for period No. 2 was one-half the amount fixed for 'period No. 1. The following table shows the respective awards, the figures representing cubic feet per second:

## AMOUNTS AWARDED APPROPRIATORS FROM THE ST. JOHNS RIVER.

| Name of Appropriator | Period No. 1 | Period No. 2 |
|---|---|---|
| Tulare Irrigation District | 175 | 87.5 |
| Tulare Irrigation Company . | 57 | 28.5 |
| Lakeside Ditch Company | 400 | 200 |
| Jennings Ditch Water Company | 20 | 10 |
| Modoc Ditch Company | 60 | 30* |
| Uphill Ditch Company | 30 | 15 |
| Packwood Canal Company | 150 | 75 |
| Mathews Ditch Company | 20 | 10 |
| Goshen Ditch Company | 40 | 20 |

(*It is to be noted that there is apparently an error in the printed clerk's transcript in that the 30 cubic feet of water awarded the Modoc Ditch Company is entirely omitted from the findings, but it is quite clearly an error in transcription, inasmuch as that quantity is included in the aggregate award.)

## AMOUNTS AWARDED APPROPRIATORS FROM THE LOWER KAWEAH RIVER.

| Name of Appropriator | Period No. 1 | Period No. 2 |
|---|---|---|
| Consolidated Peoples Ditch Company | 250 | 125 |
| Fleming Ditch Company | 12 | 6 |
| Evans Ditch Company | 47 | 23.5 |
| Watson Ditch Company | 38 | 19 |
| Oakes Ditch Company | 13 | 6.5 |
| Persian Ditch Company | 58 | 29 |
| Farmers Ditch Company | 150 | 75 |
| Tulare Irrigation Company | 40 | 20 |
| Tulare Irrigation District | 280 | 140 |
| Elk Bayou Ditch Company | 160 | 80 |

By the above awards the trial court awarded to all of the respondent appropriators, collectively, 2,000 cubic feet per second for period No. 1 and 1,000 cubic feet per second for period No. 2, the Lower Kaweah appropriators, as a group, receiving slightly more than the St. Johns appropriators. It is to be noted that the Tulare Irrigation District and the Tulare Irrigation Company appropriate from both rivers.

In fixing the aggregate award at the 2,000–1,000 cubic foot per second levels, the trial court apparently intended that the quantity awarded each appropriator was to be measured at the head of each appropriator's diversion ditch.

For purposes of convenience, however, the trial court provided that before appellant could take any water *not less* than the total aggregate award for all appropriators must be in the stream immediately above McKay Point. Each individual award is to the effect that the named appropriator is entitled to a specified quantity out of the waters of the St. Johns or Lower Kaweah Rivers, or Mill or Cross Creeks, as the case may be, diverted through a designated ditch. The court then finds that "the aggregate amount of water which the said plaintiff appropriators as aforesaid have the right to take, divert and use, as hereinbefore found, is 2000 cubic feet of water per second, *measured at the heads of their respective ditches,* or places of diversion, as aforesaid, at all times between the 1st day of February and the 31st day of July, both dates inclusive, of each and every year, and 1000 cubic feet of water per second, *measured at the heads of their respective ditches,* at all times between August 1st of each year and January 31st, both dates inclusive, of the next succeeding year, and that it requires and said plaintiffs are entitled to have a flow of water in the Kaweah River *at and immediately above the cement weir at said McKay Point,* where said Kaweah River and St. Johns River divide, *of not less than 2000 cubic feet of water per second,* at all times between February 1st and July 31st, both dates inclusive, of each year, *and not less than 1000 cubic feet of water per second, measured at said McKay Point,* at all times between August 1st of each year and January 31st, both dates inclusive, of the next succeeding year, in order to supply and furnish to said plaintiffs, appropriators as aforesaid, *at the heads of their said respective ditches,* the said respective amounts of water to which they are entitled".

The court also found "that by reason of the physical facts herein set forth, said McKay Point is a convenient and appropriate place at which to measure the flow of water in said Kaweah River at and immediately above the cement weir at McKay Point necessary to supply and furnish to said plaintiffs, appropriators as aforesaid, *at the heads of their said respective ditches,* the said respective amounts of water to which they are entitled as aforesaid".

Evidently, by these and other similar findings, the trial court desired to fix the quantity of water awarded to each

appropriator at the head of its diversion ditch, but, for convenience, the total award for all appropriators was to be measured at McKay Point, many miles upstream from the diversion ditches of some of the appropriators. It is obvious that, in addition to the 2,000–1,000 cubic feet awarded to the appropriators as a group, there must be added an appreciable quantity to make up for seepage, evaporation and other conveyance losses between McKay Point and the head of each diversion ditch. What this transmission loss would be for each appropriator is not found by the court. Hereafter, in this opinion when the 2,000–1,000 cubic feet limits or the specific awards to each appropriator are discussed, it must be remembered that such amounts must be increased by whatever this conveyance loss may ultimately be determined to be.

The trial court also found that the specific amount of water awarded each appropriator is the amount that is now and has been for more than ten years prior to the commencement of this action "appropriated, used, reasonably necessary and required at all times *when said quantity or more flowed therein, and all of the water flowing therein, when less than said amounts flowed therein"*, and is the amount required "and reasonably necessary to such appropriators for irrigation, domestic and other useful and beneficial purposes, and for livestock to drink"; that the aggregate award of 2,000–1,000 cubic feet per second *"and including all lesser flows of water* reaching the respective ditch heads or places of diversion of said plaintiffs is the quantity of water which has produced, and will produce, the respective amounts of water appropriated, beneficially used and reasonably needed and required by said respective plaintiffs for their respective beneficial uses and purposes"; that if any of the appropriators prior to the commencement of this action "failed to use the respective amounts of water which they respectively are herein found to possess the right to take, appropriate and divert, it was because said supply of said river was insufficient in consequence of the natural shortage of water and the fluctuations in the flow of said rivers"; that the appropriators have at times diverted in excess of their respective rights as found by the trial court; that at times the diversions of plaintiffs have been "diminished to amounts below said respective rights

by the pumping of water on the Rancho de Kaweah by defendant''.

The court also found several times, and expressed the finding in different ways, that there are certain extraordinary flood waters occasionally found in the two rivers here involved, to which the plaintiff appropriators have no right; that ''such extraordinary storm waters and extraordinary flood waters as do occur in said Kaweah River, and its said branches and continuations, occur at such infrequent intervals and for such short periods of time, that the same do not constitute a dependable supply of water, or a supply that can be beneficially used for irrigation purposes, unless the same be impounded and accumulated over a term of years for a regulated use''; that the rate of flow and amount of water in the rivers varies greatly and fluctuates rapidly; that ''the flow of the said rivers in the months from February to September, inclusive, is derived largely from the melting of the snows on the Sierra Nevada Mountains and the period of maximum supply and use is and has ordinarily been within the months of May and June; that in the months from October to January, inclusive, the flow is and has been derived largely from rains falling upon the watershed of said river; that the months of April, May, June and July provide a more dependable supply of water than the other months of the year and are months of greater use and requirement of water for irrigation of lands than are the other months of the year; that the flow of said rivers in said other months is less dependable and subject to fluctuations and variations of more violence, and is frequently interspersed with high flows of varying height and short duration''; that the pumping by defendant on the rancho will diminish and has diminished the amount of the underground percolating waters in the basin; that such pumping has diminished and will diminish the surface flow of both rivers by induced seepage; that said pumping creates and has created a cone of depression in the underground water table that extends beyond the limits of the rancho, and which extends under the channel of the St. Johns River for a distance of approximately five miles, and under the channel of the Lower Kaweah River for a distance of approximately four miles; that said cone of depression also extends under and has affected some desig-

nated diversion ditches of some of the plaintiffs; that there is no surplus in the delta from which the defendant can take 25,000 acre feet annually, or any other fixed sum.

The above constitutes but a brief summary of the most important findings and is not intended as a complete summary, but simply to indicate the general trend of the lower court's decision. We pass now to a discussion of the specific points made by appellant.

 Appellant very strenuously urges that, by the above findings, the respondent appropriators as a group have been awarded a *continuous* flow of 2,000–1,000 cubic feet of water per second; that such a quantity of water, except in the year 1906, has never been produced in the Kaweah watershed; that if the 2,000–1,000 cubic feet of water award be translated into the number of acre feet that would be produced by such a rate of flow *flowing continuously* during the periods involved, the plaintiff appropriators have been awarded 1,081,080 acre feet per year; that the "average" yearly run-off of the Kaweah River is about 453,000 acre feet; that, so far as period No. 2 is concerned, in which respondent appropriators have been awarded a *continuous* flow of 1,000 second feet, never in the memory of man has there flowed that quantity of water in the stream for longer than 12 days in any one year, and, on the average, that quantity has been reached only for 3½ days each year during this six-month period; that, as for period No. 1, never, in the memory of man, has the flow of the Kaweah River in any year exceeded or equaled 2,000 second feet in more than 102 days out of the 181 days in this period, and that the average over the many years of record is but 16 days. Based upon the above premises, appellant argues that the evidence indisputably shows that none of the respondent appropriators has ever diverted the quantity of water awarded to it and that it can be demonstrated to a mathematical certainty that the awards are excessive. Appellant also urges that the trial court committed error in making its awards in second feet and contends that such awards should have been made in acre feet. We are of the opinion that appellant's arguments on these points are without merit. They are based entirely on the theory that the findings and judgment here involved award to each appropriator a quantity of water that could be

provided by a *continuous flow* during each period of the number of second feet awarded. A reading of the specific findings in reference to the amount allotted to each appropriator, and the findings in reference to the appropriative right of the respondents, as a group, lends some color to this contention. Thus, in fixing the aggregate amount allotted to all of the appropriators, the court finds that they have the right to take 2,000 cubic feet of water per second "*at all times* between the 1st day of February and the 31st day of July" of each year, and the same language is used for period No. 2. In other findings similar language is employed. The judgment uses equally strong language. This language, when read literally and without reference to other portions of the findings and judgment, does apparently award a continuous rate of flow for the periods involved. It is our opinion, however, that when the findings are read as a whole and, particularly, when the findings are read in connection with the findings concerning the physical characteristics of the Kaweah River, they cannot be reasonably interpreted as awarding a quantity measured by a continuous rate of flow. We are of the opinion that the findings, properly interpreted, award a maximum rate of flow and that the court found that when the river flows at that rate, *including all lesser flows,* there will be produced the quantity that the court found respondents have heretofore appropriated and put to beneficial uses. The many findings heretofore quoted in this opinion, portions of which have been italicized, clearly indicate to us that this is the proper interpretation to be placed on the awards.

This is essentially respondents' position on this point. They concede that they, as a group, have never diverted a million acre feet annually, but contend that the trial court simply fixed a maximum rate of diversion for each appropriator, which rate, if taken when available and with all lesser rates, would produce the annual quantity heretofore diverted by these appropriators. It must be remembered that the trial court was here dealing with an extremely practical situation. It was faced with the necessity of in some way fixing the various appropriative rights of the respondents, many of which have been vested for over fifty years, and these rights had to be fixed in a stream the flow of which is extremely variable, varying, as has already been

pointed out, not only from year to year, but from day to day, and even from hour to hour. In such a stream the respondents could not, and the evidence shows that they did not, appropriate a fixed quantity each year. The amount appropriated depended upon the quantity in the stream. In such a stream, where the appropriations of respondents have varied from year to year and season to season, the trial court could not fairly award a specific quantity, measured solely in acre feet, without treating unfairly these respondents whose rights long antedate those of appellant, or without fixing the award far in excess of the reasonable needs of respondents and so injuring appellant. If the flow of the Kaweah River were even and continuous at the 2,000–1,000 cubic feet per second levels, then it is true that, under the findings and judgment here involved, respondent appropriators, as a group, would receive over a million acre feet annually, a quantity of water far in excess of the reasonable needs of respondents, and a quantity of water far in excess of that ever produced by the Kaweah watershed, except in the year 1906. Such a quantity of water would make the delta virtually a swamp. If the flow of the Kaweah River were even and continuous, or even reasonably so, then perhaps the award should have been made of a specific quantity. (*Eden Township Water Dist.* v. *Hayward,* 218 Cal. 634 [24 Pac. (2d) 492].) But here each appropriator has had to take the water when, as and if it was in the stream. It was undoubtedly for this reason that the trial court made its award by fixing the maximum rate of diversion in terms of cubic feet per second as distinguished from acre feet, and then expressly found that this maximum rate of flow, including all lesser flows, is the rate of flow that will produce and has produced the respective amounts heretofore appropriated. It is true that this leaves the exact quantity awarded to each appropriator uncertain, and it is likewise true that whenever possible the courts require that the appropriative right be fixed with certainty (*Eden Township Water Dist.* v. *Hayward, supra; San Bernardino* v. *Riverside,* 186 Cal. 7 [198 Pac. 784]), but the uncertainty here involved is caused by the fact that respondent appropriators, because of the physical conditions already described, have been unable to appropriate a fixed quantity. The quantity appropriated each year, as al-

ready stated, depended upon the flow of the streams, and that was and is highly variable. For the foregoing reasons, we do not think that the awards involved herein can reasonably be interpreted to be continuous awards in the sense argued for by appellant, nor are we of the opinion that the trial court committed reversible error in fixing the awards in cubic feet per second instead of acre feet. However, inasmuch as we are of the opinion that the awards must be reversed for other reasons hereinafter appearing, and, in view of the retrial, the following suggestion is pertinent. It is our opinion that, in view of all the physical facts, it would be fairer to all concerned if the awards to the respondent appropriators on such retrial, be made in cubic feet per second, together with an ultimate limitation in acre feet. Appellant, for reasons already stated, cannot legitimately complain of the rate of flow awards so long as the flow of the Kaweah River remains as it has been for the past thirty years. But if, from natural causes, the flow of that river should be increased, there can be no doubt that, under the rate of flow awards here made, the respondents as a group would be entitled to all that increase up to over a million acre feet annually. Admittedly that quantity has not and cannot be put to a beneficial use by respondents. Moreover, it is conceivable, that appellant may purchase the rights of some of the respondent appropriators, or purchase stock in some of the respondent companies, in which event it would have a very material interest in having the ultimate quantity to be received by those who have prior claims fixed with reasonable certainty. It is for these, and other reasons, that we believe that the awards should be fixed in cubic feet per second, with a maximum limitation in acre feet, measured, of course, by the maximum number of acre feet used by each appropriator in the past.

Before discussing the other attacks made by appellant on the awards, some mention should be made of the law applicable to the determination of an appropriator's rights.

 An appropriator, as against subsequent appropriators, is entitled to the continued flow to the head of his ditch of the amount of water that he, in the past, whenever that quantity was present, has diverted for beneficial purposes, plus a reasonable conveyance loss, subject to the limitation that the amount be not more than is reasonably neces-

sary, under reasonable methods of diversion, to supply the area of land theretofore served by his ditch. The appropriator is limited to reasonable beneficial uses. A reading of the many cases on the law of appropriation indicates a gradual and consistent tightening of the rule measuring the rights of appropriators. ▮ The early cases measured the appropriator's right by the capacity of his ditch, but that rule has long since been repudiated in this state. (*Smith* v. *Hawkins*, 120 Cal. 86 [52 Pac. 139].) As the pressure of population has led to the attempt to bring under cultivation more and more lands, and as the demands for water to irrigate these lands have become more and more pressing, the decisions have become increasingly emphatic in limiting the appropriator to the quantity reasonably necessary for beneficial uses. (*Senior* v. *Anderson*, 115 Cal. 496 [47 Pac. 454], 130 Cal. 290 [62 Pac. 563]; *California P. & A. Co.* v. *Madera Canal & Irr. Co.*, 167 Cal. 78 [138 Pac. 718]; *Northern California Power Co.* v. *Flood*, 186 Cal. 301 [199 Pac. 315]; *Oliver* v. *Robnett*, 190 Cal. 51 [210 Pac. 408]; *Pabst* v. *Finmand*, 190 Cal. 124 [211 Pac. 11]; *Eden Township Water Dist.* v. *Hayward, supra*.) If the appropriator uses more than the amount so required, he gains no right thereto. ▮ An excessive diversion of water for any purpose cannot be regarded as a diversion for a beneficial use. In so far as the diversion exceeds the amount reasonably necessary for beneficial purposes, it is contrary to the policy of the law and is a taking without right and confers no title, no matter for how long continued. (*Joerger* v. *Pacific Gas & Electric Co.*, 207 Cal. 8 [276 Pac. 1017]; *Big Rock Water Co.* v. *Valyermo Ranch Co.*, 78 Cal. App. 266 [248 Pac. 264].) ▮ In determining what is a reasonable quantity for beneficial uses, it is the policy of the state to require within reasonable limits the highest and greatest duty from the waters of the state. (*California P. & A. Co.* v. *Madera Canal & Irr. Co., supra*.) However, an appropriator cannot be compelled to divert according to the most scientific method known. He is entitled to make a reasonable use of the water according to the general custom of the locality, so long as the custom does not involve unnecessary waste. (*Joerger* v. *Pacific Gas & Electric Co., supra*.) ▮ In a case, such as the present one, where prior appropriators are attempting to secure an injunction against

a subsequent one, the action is in effect one to quiet the title of the prior appropriator. The burden of proof is on the prior appropriator, in such action, to show by a preponderance of the evidence, every element of the right claimed by him. Proof of long-continued use of a definite quantity, however, under the proper circumstances, may raise a presumption the use was necessary, for it is not reasonable to suppose that one would destroy or impair the value of his land by the use of an excessive amount. (*Joerger* v. *Pacific Gas & Electric Co., supra; California P. & A. Co.* v. *Madera Canal & Irr. Co., supra; Campbell* v. *Ingram,* 37 Cal. App. 728 [174 Pac. 366]; *Stinson Canal Co.* v. *Lemoore Canal & Irr. Co.,* 45 Cal. App. 241 [188 Pac. 77].) After the prior appropriator has satisfied this burden, subject to the above limitation, then the burden shifts to the new claimant to show by a preponderance of the evidence that, after providing for the rights of all prior claimants, there is a surplus in the water field from which it can take the amount claimed by it. It must constantly be kept in mind that in an action such as this, just as in any other quiet title suit, the plaintiffs must recover upon the strength of their own title and not upon the weakness of defendant's title.

 It should be here pointed out that the respondent appropriators are not what has sometimes been called "periodic appropriators", that is, they are not intermittent appropriators. Respondent appropriators are all corporations whose main function is to distribute the water owned by them to their respective stockholders or consumers. To do this properly each corporation requires a continuous flow, when the water is required at all. The individual consumer is a periodic appropriator, but the corporation of which he is a member, or from which he is entitled to water, is not. Appellant expressly concedes that respondent appropriators are not periodic appropriators, but does strenuously contend that such appropriators' rights and needs are seasonal.

 We pass now to a discussion of the main point urged by appellant that respondent appropriators have never diverted the quantity of water awarded to them. After reading all of the evidence set forth in the supplements filed herein, and after reading the major portion of the evidence contained in the transcript on this point and not contained

in the supplements, we are convinced that the evidence produced by respondents overwhelmingly establishes that, except in years of extraordinary flow and except for certain exceptional spurts, the respondent appropriators herein, as a group, have used practically the entire flow of the Kaweah River during the height of the irrigation season for reasonable beneficial purposes. We are clearly of the opinion that during at least four of the months included within period No. 1 respondent appropriators have for many years used, as a group, the entire flow of the river up to 2,000 cubic feet per second, whenever it was available, and all lesser flows when that quantity was not available. As found by the trial court, the months of May and June are the months of greatest supply and use. The trial court also found that the months of April, May, June and July provide a more dependable supply and are months of greater use and requirement than are the other months of the year. The evidence is overwhelming that during this four-month period for many years prior to 1916 there has been a scarcity of water in the rivers and an insufficient amount to meet respondents' needs. It would serve no useful purpose to review the voluminous testimony on this point. It is during these months that appellant would like to pump water from the delta to the lands within its borders. The evidence and findings show appellant's great needs in this period. But appellant's needs cannot justify this court in depriving other property owners of their property rights long since vested. During this four-month period the supply is not only greater than in other months, but it is a more dependable and continuous supply. It is the supply resulting from the snow run-off. The supply for the major portion of the balance of the year results largely from the rains falling on the delta and the foothills, and this supply is flashy and undependable.

However, as to period No. 2, and particularly for the months of October, November, December and January thereof, we agree with appellant that the evidence does not support either the findings that respondent appropriators as a group diverted 1,000 second feet and all lesser flows when they were available, or that the amount that was actually diverted was all put to beneficial uses. We are also of the opinion that the evidence does not support the findings

that each appropriator diverted for reasonable beneficial uses the specific number of cubic feet per second and all lesser flows when such were available, awarded to it. ▮ In discussing the question as to the extent, benefits and need of winter irrigation, it must be remembered that, although for convenience the trial court at times treated the respondent appropriators as a group, each respondent appropriator must recover, if at all, upon the strength of the evidence offered by it. Evidence as to use of water by one ditch company cannot prove how much another ditch company diverted. As an indispensable part of its case, each respondent appropriator was required to prove the amount that it had actually used in the past and, subject to the limitations already discussed, that the amount so diverted was devoted to and reasonably required for beneficial uses under reasonable methods of diversion. ▮ The necessity and benefits of winter irrigation might well be proved by general testimony not applicable directly to each ditch company, but no such general testimony can supply evidence as to the amount diverted by each respondent and what the amount diverted was used for. Such proof on behalf of each respondent appropriator was indispensable. Even at the risk of repetition, we repeat that each respondent must recover on the strength of its own title and not on the weakness of appellant's.

The inquiry as to the sufficiency of the evidence to sustain the findings in reference to the awards for period No. 2 naturally divides itself into three parts: (1) Whether the evidence supports the findings as to the amount awarded each appropriator; (2) whether the evidence supports the findings that all of the water used in this period was put to beneficial uses, and (3) whether the amount used by respondents and their methods of diversion are, under all the circumstances, reasonable. These three problems will be discussed in order.

First, as to the sufficiency of the evidence to support the specific awards made to each respondent appropriator in period No. 2. In the following summary of the evidence, we refer only to the testimony of respondents' witnesses, and will try to summarize the strongest evidence to which we have been referred, or which our own investigation has discovered, in favor of each respondent.

On the lower Kaweah River, the first diversion below McKay Point is that made through the canal known as the Consolidated Peoples ditch, supplying water for the Consolidated Peoples Ditch Company and the Elk Bayou Ditch Company. Because of its physical location, it secures the longest and most sustained diversion of any appropriator on the Lower Kaweah River. The parties hereto stipulated that the maximum area irrigated by the Consolidated Peoples Ditch Company in any one year with water from this ditch was 14,569 acres, of which 4,088 acres are devoted to alfalfa, 4,445 acres to orchards and vineyards, 4,265 acres to field crops and 1771 acres to wild pasture. Field crops include gardens, beets, beans, corn, grain, pumpkins, melons and other miscellaneous crops of like nature. Many stockholders of this ditch company were called as witnesses. J. C. Sullivan testified that he irrigated his prunes once a year in March or April; his grain once or twice a year, usually in May or June; that he irrigated his alfalfa three or four or five times a year; that the last irrigation he gave his alfalfa was usually in July. Many others testified to the same general effect. W. A. Sims, Jr., testified that he irrigated his prunes in the fall and in February or March, when the ditch water came down; that most of his fall irrigation was not secured from the ditch but from pumps; that in ordinary years he sometimes got irrigation water in November and December and that such water was used for the purpose of irrigation; that sometimes ''for several days at a stretch'', he got ditch water in January and February, which was used to irrigate fruit trees and alfalfa. E. F. Hart, superintendent of this ditch and president of the company, testified that it was the custom to irrigate alfalfa whenever they could get the water, even in December, January and February; that alfalfa can be and is irrigated by the stockholders of this company ''any month of the year''; that it is the custom to irrigate late peaches twice, in the spring and later in the summer, as late as August and September. Many witnesses testified that it was not usual to get any water from this ditch after July or the first part of August. During period No. 2, from August 1st to January 31st, this appropriator has been awarded 125 cubic feet of water per second, and all lesser flows. We can find no evidence that that quantity of water ever flowed

in this ditch in this period, nor can we find any evidence that this quantity and all lesser flows was ever diverted by this appropriator. Apparently none of the stockholders in this ditch testified as to the area irrigated in the winter months, nor as to the amount used in these months. It must be remembered that this appropriator, as well as the other respondent appropriators, with the exception of the Tulare Irrigation District, is a mutual water company and that it does not use, as a corporation, any of the water it diverts, but that it uses water only through its stockholders. The evidence above referred to establishes that when water occurs in the ditch in the winter months, some of the stockholders use it for irrigation, but that evidence does not establish the quantity diverted, or that 125 cubic feet of water per second ever flowed in this ditch in these months, or the area irrigated with what water was used. Even under a most liberal interpretation, such evidence is far too general, under the cases hereinafter referred to, to sustain the findings complained of. We realize that this evidence had to be directed to a period prior to 1916 and that appellant has been taking the water since 1918 and that the trial did not occur until 1922. Obviously, the evidence could not be as positive and certain as might be desired, but the above testimony is far too vague and indefinite to support a quiet title decree of a definite quantity of water in this period.

The Elk Bayou Ditch Company, as already stated, diverts through the Consolidated Peoples ditch. It was stipulated that the maximum area irrigated by this ditch company in any one year was 5,617 [5,637] acres, of which 4,150 acres were devoted to alfalfa, 250 acres to orchards and vineyards, 776 acres to field crops and 461 to wild pasture. In the briefs, we are not referred to any testimony by either of the parties as to the specific practice as to winter irrigation by this company. H. C. Heitzeg, president of this company, testified that this appropriator got the major portion of its water through the Peoples ditch; that it received its water by virtue of stock ownership in the Consolidated Peoples Ditch Company; that they got some little water from Outside Creek and occasionally a little from Lewis Creek, but that he could remember only 1906 as a year when his company had received Lewis Creek water; that it received

its water from the Peoples ditch only after the prior claims of the Consolidated Peoples Ditch Company were satisfied; that he could remember in "three good years . . . probably 15 or 16 or 17 years" ago, when he had irrigated as late as the 4th of July, and even later, that he was the last one to irrigate on this ditch; that it was *not* the general custom of the stockholders of this ditch company *to irrigate as late as July*. Apparently the water ceases to be used by the stockholders of this company in normal years in June. For whatever irrigation is carried on after that, the water is procured, not from the ditch, but from pumping plants. This company has been awarded 80 cubic feet per second and all lesser flows in period No. 2. Such award, based, as it must be, on past use, finds absolutely no support in the record.

The Lakeside Ditch Company diverts from Cross Creek, the continuation of the St. Johns River, and has been awarded 200 cubic feet of water per second, and all lesser flows in period No. 2. The maximum extent of the acreage under this ditch is in dispute, appellant conceding that 17,567½ acres are irrigated from this ditch, this respondent contending for a larger area. According to appellant's admission, 5,688 acres of the above total are devoted to alfalfa, 339½ acres to orchards and vineyards, 6,171 acres to field crops, and 5,369 acres to wild pasture. This respondent offered evidence that a larger maximum area was served by this ditch, but the above figures give an approximate idea of the nature of the crops grown and general division of the area among them. The superintenlent of this ditch, J. B. Freeman, testified that it was the custom to irrigate grain once from April to about June 1st; that some water usually comes into the ditch in February, "some little water, not a great bulk", and some in March; that sometimes they get some water as early as December; that the winter water is the result of rains; that it comes in spurts; and that it is not dependable; that the snow run-off constitutes the dependable supply and starts usually around April 1st and continues to about the middle of July; that the stockholders irrigate their alfalfa from the ditch about three or four times a year and irrigate their orchards twice a year; that the water seldom runs in the ditch after July; that he had been super-

intendent of the ditch for four years and had been engaged in farming and irrigating from the ditch for 11 years; that "we have never had any water since I have been in the Lakeside country, only in one instance, after July"; that "since I have been superintendent, the latest that we have had water in the ditch—I think last year .[1921] was the latest, I think it went out on the 9th of July"; that prior to becoming superintendent he could remember one year—1915 or 1916—"when we had some water in August, but I couldn't say exactly how much at that particular time"; that he irrigated his alfalfa as soon as water was in the ditch any time after the first of the year; that occasionally they got a "little bit of water" in December.

E. W. Kerr testified that he had been familiar with the Lakeside ditch since 1875 and that he irrigated from it; that from 1877 to 1902, on various occasions, he had acted as ditch tender for this appropriator; that water usually comes into the ditch in February; that occasionally spurts occur in January, but that that is not the usual thing; that the irrigators from this ditch do not expect to get a run of irrigating water until the snow water comes from the mountains; that the snow run-off usually comes in April and extends to about the 15th of July; that he had never noticed any irrigators irrigating grain in the fall of the year in the Lakeside territory for the reason that "No, never had the water in the fall of the year".

E. H. Kimble, another irrigator from this ditch, testified that they sometimes got rain water in December and January, but when pressed as to quantity stated, "Well, sometimes we would get—there are periods for a few days when we have quite a run of water, but it don't last long, generally." Other stockholders testified in equally general language as to December and January irrigation water. The evidence as to the use of water from this ditch from September to December was very sketchy and even January was not very clear. The evidence above quoted falls far short of sustaining a finding that all during period No. 2 this appropriator used the quantity awarded to it and all lesser flows. If the water was not there in any month or for any other appreciable period, it should not have been awarded.

The Watson Ditch Company diverts from the Lower Kaweah River and has been awarded 19 cubic feet per

second and all lesser flows in period No. 2. The parties could not agree as to the maximum area irrigated by this ditch, the appellant conceding that 1828½ acres were irrigated, this respondent claiming and proving a larger area. The crops grown here are similar to those grown on other parts of the delta, consisting of alfalfa, orchards and vines, field crops and wild pasture. E. R. Pennebaker, an irrigator from this ditch, testified that he irrigated his orchards twice, in April or May, then in June or July; that alfalfa is irrigated four times; that he could not count on getting a fall irrigation for his fruit; that from his observation irrigations from this ditch started in April and ended in August or September; that in 1916 the water started to run in the ditch in November and ran all winter; that he did not remember the quantity but that it was a good run. He did not testify that he or anyone else used this water. In reference to this testimony, respondents argue: "It must be obvious if there was a fairly good run of water in the Watson Ditch during all the winter, as Mr. Pennebaker testified, that the stockholders of that ditch must have used it even if Mr. Pennebaker personally did not use it. It certainly could not continue running down the ditch all winter without being used. None of respondents' ditches have waste-ways." This negative inference is not sufficient to sustain a right to divert any fixed quantity of water during this period.

John N. Haggler testified that he used water "indifferently" from both the Watson and Persian ditches; that he usually would irrigate his alfalfa four or five times a year, starting in December or January, but that if he irrigated in December he would not do so in January. Other than this very general testimony as to use in December and January, there is no evidence that the irrigators under this ditch ever diverted any quantity in the winter period, or what area, if any, was irrigated in this period.

The Mathews Ditch Company diverts from the St. Johns River and has been awarded 10 cubic feet per second and all lesser flows in period No. 2. The parties stipulated that the maximum area ever irrigated with water from this respondent was 928 acres, of which 692 were devoted to alfalfa, 14 to orchards and vineyards, 192 to field crops, and 30 acres to wild pasture. Morgan Rush testified that

he had irrigated from this ditch for 18 years and owns over a quarter of the area irrigated from this ditch; that when he first knew the ditch "for a few years there it had water pretty late and some years pretty near all of the summer"; that in the early years it had water for nearly all the year, which water was used for irrigation; that the irrigators irrigated some in the fall months, when they had the water, and "some in the winter"; that he irrigates his pasture once or twice a year, but never later than June.

Fred Van Gordon, an irrigator from this ditch and superintendent of the same, testified that he had lived at his present home for 12 years; that for the first couple of years after moving to his present abode, the ditch "never did go dry"; that it had water in it the year round; that he did not know whether that water was used—"I know I used my part of it whenever I got it", for irrigation purposes; that at present he sometimes got water in December; that winter irrigation "did not seem to hurt his alfalfa any and killed the gophers out". Other irrigators testified that in their recollection the ditch on occasion had water in it all the year round, which water was used for irrigation, but none of them estimated the amount of water in the winter period nor the area irrigated. Other stockholders testified they never got water after September. Mrs. S. E. McCain testified that although she could remember a few years when the water ran the year round, she never used it the year round. Such evidence is insufficient to support the finding here under attack.

The Modoc Ditch Company diverts from the St. Johns River and has been awarded 30 cubic feet per second, and all lesser flows, in period No. 2. It was stipulated that the maximum area served by this ditch is 3,590 acres, of which 2,000 acres are devoted to alfalfa, 84 acres to orchards and vineyards, 850 to field crops, and 656 acres to wild pasture. John Riggin testified that he had been superintendent of this ditch since 1900; that he ordinarily commenced his duties in March or April and stopped when "the water stops", which is usually in August; that "once in a great while" they got water in January or December; that the stockholders at the lower end of the ditch liked to get water for irrigation in the winter. Timothy Hayes testified that he sometimes got water in January, and that when it did come it was always used; that in "one or two years"

he could remember getting water in December. John Perry testified that he used winter water when he could get it for irrigation and that it was good for his crops. James B. Rivers testified that he had irrigated his alfalfa in January and that such was the common practice. Other irrigators from this ditch testified that they never irrigated their alfalfa in December, January or February, and still others that they did not practice winter irrigation. The evidence shows that the irrigators from this ditch have used some winter water, but what the amount used or the area irgated therefrom may be is not disclosed.

The Uphill Ditch Company, the Jennings Ditch Water Company, and the Packwood Canal Company, all diverters from the St. Johns River, are treated as a group by respondents, and we will follow that course here. The Uphill Ditch Company has been awarded 15 cubic feet per second in period No. 2, the Jennings Ditch Water Company 10, and the Packwood Canal Company 75. The maximum area irrigated from the Uphill ditch was stipulated by the parties as being 1873 acres, 1148 being in alfalfa, 124 in orchards and vineyards, 107 in field crops, and 494 in wild pasture. The testimony as to actual practice as to winter irrigation under this ditch was very sketchy indeed. Monroe Rush, superintendent of this ditch, testified that he had been acquainted with the ditch for 30 years; that since he had been superintendent (from 1909 or 1910 to 1916) and again just prior to his testimony (which was in 1922) he closed the headgates of this ditch when the snow water ceases in August and kept them closed until about February of the next year.

According to appellant, the Jennings Ditch Water Company furnishes water to but 399 acres, this respondent claiming a larger area. The area is mainly devoted to the growing of alfalfa and field crops, with some acreage devoted to orchards and vineyards and a small area in wild pasture. George Bollinger, who had used water from this ditch for 15 years and who also received water from the Watson ditch, testified that he used water whenever it was present; that the *earliest* that he had ever received water from the ditch under discussion was *February;* that he could not remember ever getting water from either of the ditches *after July*. Peter Fleutsch, superintendent of the ditch and also an irrigator therefrom, with 16 years' ex-

perience, testified that he could remember two years when he got water as late as August. Ernest Langdon testified that sometimes stockholders of this ditch do not require all the water in the ditch and permit some to flow down Mill Creek; that he tried to irrigate his prunes in the fall; that he got water from the Wutchumna ditch as well as from the Jennings ditch.

The Packwood Canal Company, according to the stipulation of the parties, serves water to a maximum area of 3,000 acres, 1460 acres of which are devoted to alfalfa, 536 to orchards and vineyards, 916 acres to field crops and 79 acres to wild pasture. No satisfactory evidence of any kind was offered on the question of winter irrigation under this ditch. E. H. Kimble, an irrigator under this ditch, testified that he did not irrigate his orchards at all from the canal and that he irrigated his alfalfa from the canal but once or twice a year; that for the past ten years [1912–1922] "we haven't had a great deal of water in Packwood . . . the Packwood is a short stream of water you know, we do only get high water, that is all we get"; that most irrigators in this section use pumping plants for irrigation. W. H. Wilbur, a farmer who had irrigated from this ditch since 1906, testified that before installing his pumping plant in 1914, he irrigated his alfalfa but once a year from the ditch—sometimes twice; that from 1917 to 1921 he had no water at all from Packwood; that he had a "good run" in 1916 and a short run in 1921, from which he irrigated 25 acres; that occasionally water for irrigation was in the canal as late as June or July; that a "good run" was had in 1922 in the summer; that he got probably half of his irrigation water prior to 1916 from the Tulare Irrigation District. J. F. Carroll, who had known the Packwood canal since 1887, testified that prior to 1916 "we would get as many as three runs"; that there were some years "we would not get any at all and some years we would get one run". Not one word of testimony was offered that this ditch, in the memory of any witness, ever had any water during period No. 2, and yet the trial court awarded this appropriator 75 cubic feet per second and all lesser flows for this period.

Respondents concede that "as to the respondents Jennings Ditch Water Company, Uphill Ditch Company and Packwood Canal Company there seems to have been

little testimony offered as to the actual practice of winter irrigation over these particular ditches". The respondents argue, however, that there were many witnesses from other portions of the delta who testified that fall and winter irrigation was a matter of common practice on the delta. They urge that the trial court was dealing with a large number of respondent appropriators who were grouped together in a common cause. Based on these premises, it is then urged that "testimony from witnesses in different parts of the delta that winter irrigation was a common practice and was beneficial . . . was sufficient to justify the trial court in awarding water to the Uphill Ditch Company for the same months that it awarded it to the other appropriators who made more specific proof. The same is true in reference to the Jennings Ditch Water Company and the Packwood Canal Company. There was such an abundance of evidence as to winter irrigation on the Kaweah Delta that it was not essential that every one of the appropriators present specific evidence on that question. If appellant, who admits the prior and superior right of all these appropriators to any right held or asserted by it, claimed that any of these appropriators had abandoned the water for the months of November, December and January, the burden was upon it to prove such abandonment, and no attempt was made by appellant in that direction." No cases are or can be cited to sustain such a conclusion. Such a conclusion is based on several misconceptions of the law applicable to the facts involved herein. As repeatedly stated in this opinion, each respondent appropriator was in effect attempting to quiet its title to a certain quantity of water as against appellant. Although each respondent appropriator had a common cause as against appellant, for purposes of ascertaining the quantity of water heretofore used by each appropriator, each appropriator had the burden of proof of showing by a preponderance of the evidence the amount it had diverted in the past. Evidence offered by one appropriator on this issue could not help any other appropriator. Evidence as to custom and usage on the delta generally could not tend to show that any one appropriator in the past had actually diverted any specific quantity. Moreover, it was not incumbent on the appellant, as stated in the concluding portion of the above quotation,

to prove a negative. The affirmative on this issue rested with respondents. We find no evidence at all that these three appropriators ever appropriated the quantities awarded them, together with all lesser flows, in period No. 2. The findings in this regard are totally unsupported.

The Evans Ditch Company diverts from the Lower Kaweah River and has been awarded 23.5 cubic feet per second in period No. 2. The parties could not agree as to the maximum area irrigated from this ditch, appellant conceding that at least 2,481 are so irrigated, respondent contending for a larger area. The crops grown are similar to those under the other ditches, with about 400 acres devoted to wild pasture. Charles H. J. Hausch, an irrigator under this ditch, testified that he needed the water as often as he could get it and oftener than he did get it; that he needed it throughout the year; that at least one year he got water throughout the year, which water was used for irrigation; that he tried, when water was available, to irrigate fox tails in winter for winter feed; that he irrigates alfalfa four times a year, grain and corn, once. G. L. Caldwell, superintendent of the ditch, testified that water came down the ditch in the fall and winter and that it was used to irrigate crops; that he apportioned the water among the stockholders whenever it was present in the ditch; that sometimes the water started to run in December and continued until August; that he closed the headgate of this ditch at the end of the irrigation season, apparently for the purpose of cleaning the ditch. Creed Archer testified that irrigators from this ditch used the water whenever it was present in the ditch and had used it for irrigation every month in the year. The evidence offered on behalf of this respondent did show that some water was present in this ditch in the winter period and that it was used for irrigation. No evidence, however, was offered as to the amount that was diverted during the winter period, or the area that was irrigated.

The Tulare Irrigation District diverts from both rivers. It has been awarded 87.5 cubic feet per second from the St. Johns River and 140 cubic feet per second from the Lower Kaweah River and all lesser flows in period No. 2. The maximum area ever irrigated in any one year by water diverted by this respondent was stipulated to be 12,199

acres, of which 7,905 are in alfalfa, 602 in orchards or vineyards, 2,823 in field crops and 869 in wild pasture. C. H. Slaughter, superintendent of the district, testified that as a general thing they could get only one irrigation a year from the canal of the district; that they supplemented the canal water with pumping plants; that they irrigate alfalfa and the orchards every month in the year (apparently from the pumping plants). J. B. Tingley, a former ditch tender for the district, testified that in 1915 the water started in the ditches of this respondent in April and ceased in July. C. H. Morris testified as to the benefits of winter irrigation and that he got water from the canal in February, 1922, from which he irrigated 12 acres. As to this appropriator, respondents concede ''There is little testimony in the record specifically bearing upon the subject of winter irrigation from the canal system of Tulare Irrigation District, but there is testimony as to the benefits of winter irrigation''. Obviously, an award of 227.5 cubic feet per second and all lesser flows cannot be upheld on such testimony.

The Tulare Irrigation Company likewise diverts from both streams. It has been awarded 28.5 cubic feet per second from the St. Johns River and 20 cubic feet per second from the Lower Kaweah River and all lesser flows in period No. 2. The maximum area irrigated with water furnished by this company has been stipulated to aggregate 5,284 acres, of which 1588 are in alfalfa, 942 in orchards and vineyards, 2,279 in field crops and 475 in pasture. H. A. Scott, superintendent of the ditch of this appropriator and an irrigator therefrom, testified that usually the water ceases to run in this company's ditch in June or July; that ''one year we ran up into August, but generally, it quits in July''; that he never ran water in the ditch in September, October or November; that he had irrigated from the ditch and knew others who had likewise done so in December, January and February. R. E. Hess, an irrigator under this ditch, testified that ''I think the earliest run we ever got was in February from—up to about, some years, as late as the first of August, perhaps just a little before that''; that they had never got an ''irrigating run'' of water prior to February, but did occasionally get ''spurts'' before that. Walter N. Goins, another irrigator, testified that they could profitably use irrigation water any month in the year; that

prior to 1916, when they had a "little extra water" they would irrigate in the winter "but not very much"; that they always irrigated when they had the water; that he could not state the number of times he had irrigated in the winter prior to 1916; that he probably irrigated in the winter "a couple of times" between 1907–1917. Again, we find no evidence at all as to the amount diverted in the past or the area irrigated with what was diverted. Evidence that they could use water if they had it, of course, cannot sustain a finding awarding a specific rate of flow and all lesser flows which must be based on past use.

The Goshen Ditch Company diverts from the St. Johns River and has been awarded 20 cubic feet per second and all lesser flows during period No. 2. The maximum area irrigated by water furnished by this appropriator was stipulated to be 1867 acres, of which 720 are devoted to alfalfa, 2 to orchards and vineyards, 545 to field crops and 600 acres to wild pasture. E. Y. Logsdon, an irrigator under this ditch and one of the directors of this appropriator, testified that in 1912 no water at all ran in the ditches of this company; that in 1913 the water ran but 8 or 10 days; that in other years the ditch normally goes dry about the end of June; that the water came into the ditch in January, 1922; that in his 11 years' experience he had never known that to occur before; that if the water is available it is beneficial to irrigate in January and he has done so with water pumped from wells; that they irrigate alfalfa as late as November, apparently from wells. Such testimony is totally insufficient to show that any definite quantity was ever diverted for any purpose during the period here involved.

The Farmer's Ditch Company diverts from the Lower Kaweah River and has been awarded 75 cubic feet per second and all lesser flows for period No. 2. The parties agreed that the maximum area ever served by this appropriator was 7,365 acres, of which 2,850 are in alfalfa, 1378 in orchards and vines, 2,840 in field crops and 297 in wild pasture. Frank Rhoades testified that he had been familiar with this ditch since 1900; that in 1913 "there was maybe a week of water in January"; that then the water ceased flowing and did not commence again until March or April; that on a "general average" the water ceased flowing in this ditch between the 20th of June and the 10th of July;

that in 1915 the water started in January and ran until July; that there was no winter run in 1916 or 1918, a little in 1917. During the course of this witness' testimony, while he was discussing the *benefits* of winter irrigation, the trial court stated: "I do not want to arbitrarily limit the examination, but do you think yourselves that you have gone far enough *into the benefits* of winter irrigation on alfalfa? We have had it for two weeks." We can agree with the trial court, as already stated in this opinion, that the benefits of winter irrigation can be shown by general testimony, and that testimony that alfalfa was benefited by winter irrigation under one ditch would sustain a finding that it is beneficial under other ditches similarly situated, but we do not agree with respondents that evidence that winter irrigation was practiced under one ditch can justify or sustain a finding awarding a specific quantity to another ditch. There is no evidence at all to sustain the finding here under attack.

The Persian Ditch Company diverts from the Lower Kaweah River, and has been awarded 29 cubic feet per second, and all lesser flows, in period No. 2. Appellant concedes that this ditch serves at least 1931 acres, respondents contending for a larger area. Alfalfa and field crops are the principal crops grown, with an appreciable area devoted to orchards and vineyards and a relatively small area to wild pasture. T. A. Elliott, an irrigator from this ditch and formerly president of the board of directors of this appropriator, testified that he had been familiar with and had intimate knowledge of the Persian Ditch since 1898; that he irrigated alfalfa 3 to 6 times a year, corn twice, orchards in October or November and in the spring (February or March) and again in July; that they irrigate alfalfa whenever they can get the water, but winter irrigation of alfalfa is not practiced much because the water is not there to be used; that he does not irrigate alfalfa from pumps in the winter because it is not good practice "to irrigate alfalfa too much during the cold weather,—that is simply my opinion . . . "; that he had some recollection of getting a "flow of water" in some years in November and December, "but that is not what I term an irrigating season because the water with us in the ditches is not usually a continuous flow where it can be said to be run as an irrigat-

ing ditch; the first man who can grab the water probably gets it because there is no ditch tender on the ditch'' in the winter months; that, although he knew of times when the water had come in December, January and February, ''very infrequently if at all'' was there enough to irrigate all the lands entitled to water from this ditch. J. F. Putnam, former superintendent of this ditch, testified that the length of time the water ran in the ditch varied from year to year; that ''there was one year (between 1904 and 1908) that it run pretty near the whole season; of course, the latter part of it they did not irrigate much, but it run for stock water''; that he could not remember what year that was. Again we find a complete lack of evidence to establish this appropriator's claim that by past use it has established a right to divert in period No. 2, 29 cubic feet per second and all lesser flows. There is no evidence at all as to the amount or quantity or rate of flow diverted in the past, nor is there any evidence as to the area irrigated in the winter season.

The Oakes Ditch Company diverts from the Lower Kaweah River and irrigates a maximum of 1,022 acres, of which 216 are in alfalfa, 237 in orchards and vineyards, 287 in field crops, and 282 in wild pasture. Respondents refer us to no testimony supporting the finding awarding this appropriator 6.5 cubic feet per second and all lesser flows in period No. 2. The only testimony offered in reference to this ditch was apparently that of Byron W. Allen, who testified that he had known this ditch since it was built; that he irrigated alfalfa four times a year; that that number of irrigations was enough; that in June they generally got a sufficient head for irrigation purposes; that in July and August the supply of water is generally short. We have been referred to no testimony at all that there ever was diverted any quantity at all from this ditch for winter irrigation. The finding under attack is totally unsupported.

The Fleming Ditch Company also diverts from the Lower Kaweah River and, according to the stipulation of the parties, irrigates a maximum area of 1014 acres, of which 372 are in alfalfa, 408 in orchards and vineyards, 84 in field crops and 150 in wild pasture. Apparently but one witness was called to testify as to this ditch, U. D. Switzer, manager of the ditch since 1885 and acquainted with it since 1879. He testified that in a good year ''I have seen the water run in the Fleming Ditch up to the 1st of October'';

that then the water was turned out of the ditch to clean it and after cleaning it the water started to run again; that when it would start depended on the rain; that sometimes it started to run in November or December and some years not until February; that in many years, which he enumerated, water ran in the ditch in November and December and ran continuously the rest of the season; that orchards were irrigated late in the fall or early winter; that alfalfa was irrigated whenever they could get the water; that he could not tell the amount of water in the ditch in these winter runs, "that varies". We find no evidence that this appropriator, during period No. 2, appropriated 6 cubic feet per second and all lesser flows.

We have referred to the evidence in reference to each corporate appropriator at some length. Every one of the witnesses referred to above was called as a witness for respondents, and we have tried to select the strongest testimony in favor of respondents. Such evidence falls far short of establishing the first element required to prove a right gained by appropriation, i. e., that the quantity awarded was actually, in the past, diverted and used by the one claiming the right. In not one case was there any evidence at all that any specific quantity had been diverted in period No. 2 by any one appropriator, nor was there any evidence as to the area actually irrigated in the winter period. The evidence does show in reference to some of the ditches that when water was present it was used, but not how much was used; that water was not often there, particularly in October, November, December or January; that some ditches never did have any winter water; that some appropriators could use more water, if they had it. Such evidence is not sufficient under the authorities, to sustain a finding awarding a specific rate of flow and all lesser flows, for a definite period. In *Pabst* v. *Finmand,* 190 Cal. 124, 133 [211 Pac. 11, 15], this elementary rule was restated as follows: "Claimants to gain a right to the use of a definite amount of water *must show that the quantity of water awarded them has been actually diverted,* that it was applied to a beneficial use, and that the amount claimed was reasonably necessary for such use." In discussing evidence somewhat similar to that produced here, and in holding such evidence insufficient, the court, in the Pabst case, *supra,* at page 134,

pointed out that "although there is testimony that defendants used all they wanted *there is no testimony to prove the use of any specific quantity of water for any particular time"*. In *Northern California Power Co.* v. *Flood,* 186 Cal. 301, 304 [199 Pac. 315, 317], it is stated, "In order to gain a right to the water the diverter must actually use it and *the quantity used measures the extent of his right"*. See, also, *Turner* v. *East Side Canal Co.,* 169 Cal. 652 [147 Pac. 579]; *California etc. Co.* v. *Madera Irr. Co.,* 167 Cal. 78 [138 Pac. 718]; *Haight* v. *Costanich,* 184 Cal. 426 [194 Pac. 26]; *Cohen* v. *La Canada Land etc. Co.,* 151 Cal. 680 [91 Pac. 584, 11 L. R. A. (N. S.) 752]; *Smith* v. *Hawkins,* 120 Cal. 86 [52 Pac. 139]; *Senior* v. *Anderson,* 130 Cal. 290 [62 Pac. 563].

▇ It must be remembered that appellant herein has an important legal interest in having the rights of respondents fixed, as a maximum, at the amount diverted by such respondents in the past. The appellant is the owner of about 1100 acres of water bearing land in the delta, which land is so situated and its physical characteristics are such that it is and can be used as a natural underground reservoir. As the owner of such overlying land, the appellant has the legal right to extract water therefrom and to convey the same to distant lands for beneficial purposes, subject always to the condition that prior rights are not interfered with or injured thereby. (*Burr* v. *Maclay Rancho Water Co.,* 154 Cal. 428 [98 Pac. 260]; *Newport* v. *Temescal Water Co.,* 149 Cal. 531 [87 Pac. 372, 6 L. R. A. (N. S.) 1098]; *Katz* v. *Walkinshaw,* 141 Cal. 116 [70 Pac. 663, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236].) The appellant, therefore, has a vital interest in having the rights of each prior claimant fixed and determined at the amount that prior claimant has, in the past, actually diverted. ▇ It is no answer to say, as do respondents, that appellant did not prove that any quantity flowing in the two rivers was wasted. The burden was on respondents to show the amount they had diverted, not on appellant. Nor is it an answer to appellant's contentions on this point to say, as do respondents, that, as a group, they must have used all the water in the two rivers, because there are no wasteways on any of the ditches and, therefore, the water must have been used. Assuming the evidence would support such a finding, had it

been made, such evidence would not justify a specific award in any quantity to any particular appropriator in this period. As already pointed out, appellant, as a matter of law, was entitled to have each respondent appropriator's right determined by the amount actually diverted by *that* appropriator in the past. The respondents cannot, on this point, be considered as a group—each one must be considered individually—and its title to the water can be quieted only upon the evidence offered by it. The reasons for this have already been discussed at length.

It should also be pointed out that the evidence shows that each appropriator closes its headgate for between two weeks to a month each year. No water should be awarded any appropriator during any period when it is not using it.

For the foregoing reasons, we are of the opinion that the awards. cannot be sustained and that the judgment based thereon must be reversed.

We are also of the opinion that the evidence does entirely support the findings that *all* the water that was used in the winter period (whatever the amount may have been) was put to beneficial uses. Preliminarily, it should be stated that, whatever quantity an appropriator has actually diverted in the past, he gains no right thereto unless such water is actually put to a reasonable beneficial use. (26 Cal. Jur. 93, sec. 286.) What is a beneficial use, of course, depends upon the facts and circumstances of each case. What may be a reasonable beneficial use, where water is present in excess of all needs, would not be a reasonable beneficial use in an area of great scarcity and great need. What is a beneficial use at one time may, because of changed conditions, become a waste of water at a later time.

On the subject of the purposes to which the winter water was put, there was considerable evidence introduced by respondents, the trial court, in fact, at least once suggesting that it had heard enough on this point.

Many of the witnesses produced by respondents were extremely vague as to the benefits of winter irrigation. One of them testified that winter irrigation "did not seem to hurt my alfalfa any and killed the gophers out; and I think where you irrigate early that way your alfalfa comes better". Another testified that from winter irrigation "the first

benefit is you get rid of all your gophers, if you can irrigate in cold weather, or the spring—you get rid of your gophers and soak your land up thoroughly, and when the warm weather comes it starts the alfalfa to grow''. Still another testified that he irrigated in December and January for the purpose of drowning out gophers and that such was the principal purpose of irrigating at that time, together with the purpose of starting the fox tail and wild feed. Another stated, ''A man will always irrigate his alfalfa in the winter season if it is not raining, it helps to kill the gophers.'' Another, ''We surface irrigate to rid ourselves of the gophers . . . if you irrigate in the early spring you drown lots of them, freeze them to death''. Another gave it as his reason for irrigating in winter that ''every time we irrigate we kill gophers . . . the best season of the year to kill gophers is with cold water, irrigate in cold weather and kill them. The same thing with squirrels. You irrigate the squirrels in cold weather, in February, he gets wet and comes out and freezes to death.'' Many other quotations could be made to the same effect. A great many of respondents' witnesses seemed to be of the opinion that the only reason they irrigated during the winter season was to exterminate these pests. It seems quite clear to us that in such an area of need as the Kaweah delta the use of an appreciable quantity of water for such a purpose cannot be held to be a reasonable beneficial use. This seems to us so self-evident that no further discussion of the point is necessary. We, therefore, hold that whatever quantity of water was used by respondents solely for this purpose during the winter period was not devoted to a beneficial use and that, in so far as the finding of the trial court now under discussion is based on such use, it is unsupported by the evidence.

 However, there was considerable other evidence introduced by respondents, clearly indicating that some of the water used by them in this period was used for reasonable beneficial purposes. Many practical irrigators, as well as experts, testified to this effect. Some testified that from their experience winter irrigation caused the plants to start active growth earlier in the spring, thus assuring a larger and better crop; others that it stores moisture in the soil so that, if there is a scarcity of water later in the year, the plants are sustained; others that it provides green feed for

cattle in the winter months; others that by winter irrigation there is produced an extra cutting of alfalfa; others that it strengthens the first buds and sustains the trees. There is considerable evidence in the form of government reports, showing the benefits of winter irrigation in this and similar areas. All this evidence indicates that some of the water used in the winter months was put to beneficial uses.

Appellant argues that the evidence shows that winter water is produced by rains falling in the foothills and on the delta at infrequent intervals and comes in spurts (which is the fact) and contends that since it cannot be predicted when such spurts will occur, or how much water they will produce, they cannot be deemed to be a reliable source of supply and cannot be deemed to be put to beneficial purposes. We cannot follow the logic of this argument. Such argument, if sound, would necessarily result in the conclusion that one could never gain an appropriative right to the waters of a variable stream. If the respondents have used a definite quantity of water in the winter months for beneficial purposes, when such quantity was in the stream, they are clearly entitled to be protected, even though the amount cannot be predicted with certainty, or is of infrequent occurrence.

This argument as to winter spurts is somewhat similar to another argument advanced by appellant, which is equally without merit. Appellant argues that in considering the beneficial use of water in any water area, the appropriators therein can acquire only an appropriative right to a quantity of water equal to some amount slightly over the mean low average produced in the watershed. Appellant contends that in any watershed where the lands are surface irrigated, only that area can be economically put under production that can be irrigated by the "average" yearly run-off, less a large margin of safety. Any diversion in excess of the average yearly run-off, less a margin of safety, cannot, according to appellant, ever be put to a beneficial use. In other words, appellant contends that it does not matter what quantity the appropriators as a group actually have diverted in the past, and put to what ordinarily would be beneficial uses, they cannot gain any right to an amount in excess of the average annual run-off, less a margin

of safety. Such a rule finds no support in the cases. It may be that, in a stream with a reasonably even and continuous yearly flow, an appropriator can gain no right to extraordinary additions to that stream. We do not decide that point. But in reference to a stream such as the Kaweah River, no such rule could possibly be applied. There is no such thing as an "average" run-off of that stream. The United States Geological Survey from 1903 to 1921 made continuous flow measurements at Three Rivers, upstream a few miles from McKay Point. These records show that in 1912 the seasonal run-off was 207,410 acre feet. In 1906, the run-off was 1,088,440 acre feet. In 1916, the run-off was 762,160 acre feet, while in 1917, it was 471,470 acre feet, and in 1919, 229,700 acre feet. In the last year preceding the trial (1921), the run-off was 355,387 acre feet. The other years showed great variations within the maximum of 1906 and the minimum of 1912. Such a stream has no "average" run-off. Moreover, appellant's argument could be applied only where the prior appropriators use the water to irrigate permanent crops such as orchards and vineyards. Such crops, if they were solely dependent on surface irrigation derived from the Kaweah River, which they are not, necessarily would be economically limited to an area that could be irrigated by an amount of water reasonably to be expected each year. But such an argument can have no application to an area where about two-thirds of the total area is devoted to annual crops. As already noted, the most dependable supply from the Kaweah River is from the snow run-off in the spring. Long prior to planting time, the farmers of the delta have accurate information as to the snow pack in the mountains and can reasonably estimate the amount and duration of the spring run-off, and can and do plant their annual crops accordingly. The argument of appellant on this point is totally without merit and need not be considered on the retrial. The respondent appropriators are entitled to be protected in the amount they have heretofore diverted, when it was present, for reasonable beneficial uses under reasonable methods of use and diversion.

The third element necessary for the acquisition of a right by appropriation is that the water must be diverted

under reasonable methods of use and reasonable methods of diversion. Appellant spends many pages of its briefs in an attempt to show that the quantity of water each appropriator has heretofore diverted throughout the year is greatly in excess of the quantity actually necessary to supply the beneficial purposes of the appropriator and contends that such excessive use of water has resulted in an injurious high water table with the creation of alkali and deterioration of the soil. Appellant further contends not only that there is an excessive use of water, but also that respondents' methods of diversion are wasteful. We are clearly of the opinion that both these points are without merit.

First, as to respondents' alleged excessive use of water. We do not find it necessary to review in detail the evidence on this point. Appellant concedes in its reply brief that "As might be expected, the evidence of the opposing parties as to the effect of the use of water upon the Kaweah Delta in the amounts heretofore diverted by the respondent appropriators, in so far as it created untoward conditions . . . is conflicting". Appellant spends many pages reviewing the testimony of its experts, tending to show that there was an excessive use of water on the delta. Stripped to its essentials, this argument is simply that testimony offered by it is more credible than that offered by respondents. Respondents offered evidence in abundance, both from practical irrigators and from experts, indicating that, under the system of irrigation there prevailing, the quantity used was reasonably necessary. Appellant's attack on this ground, cannot be sustained. Testimony as to damage to the soils of the delta, alleged to have been caused by the excessive use of water, with a resulting high water table, was highly conflicting. From reading the expert testimony presented by appellant, one would be led to believe that the Kaweah delta is rapidly becoming either a swamp or an alkali waste, while the experts for respondents would have us belive that the delta is a veritable Garden of Eden. In fact, the expert evidence was so conflicting that, even when these experts attempted to describe the physical conditions surrounding specific stations in the delta, it is only by a reference to the number of the station that it can be ascertained that the experts are talking about the same spot. The evidence

amply supports respondents' contentions on this point. On this general subject of excessive use of water, we deem it pertinent to refer to what was said in *Stinson Canal & Irr. Co.* v. *Lemoore Canal & Irr. Co.,* 45 Cal. App. 241, 252 [188 Pac. 77]: "There is this, also, to be said, that it is not at all probable that a number of farmers would use, for many years, for the purpose of irrigation, an amount of water that would destroy or impair the value of their land. Of course, they would not willingly do so; and it is hard to believe that, in these days of intelligent and scientifically directed agriculture, these men, who have located and built up a thriving community, would make such a grievous mistake as deliberately to cause their lands to become waterlogged and depreciated for all the purposes of husbandry. The very fact that they used for so many years a certain quantity of water, is indeed, very persuasive evidence that such quantity was actually needed for such purposes. It is not conclusive evidence of that fact, but it is a circumstance of impressive significance."

Appellant also contends that, because of the alleged poor methods of diversion used by respondents, excessive quantities of water are used by them. There can be no doubt that respondents as a group do not divert the water in the most scientific manner. There can be no doubt that in some cases, because of the paralleling of the ditches of some of the respondents, there is an uneconomic use of water. If all of the respondents constituted one appropriating unit, then perhaps there would be some merit in appellant's contention that respondents' methods are wasteful. But these various appropriators are not one unit—each one has its own appropriative right, gained by many years of use. The courts cannot and, even if they had the power, should not compel these appropriators, many of whom have been diverting water for over fifty years, at their expense, to build new systems of diversion.

It is true that most of the ditches of the respondents are earthen ditches and that, in the porous soils of the delta there is a resulting large conveyance loss caused by seepage. Respondents concede that under the system now prevailing on the delta there is a conveyance loss of between 40 to 45 per cent. Appellant contends that reasonably such conveyance loss should not exceed 30 per cent. For various

reasons, appellant's contention cannot be sustained. In the first place, there were introduced into evidence various state bulletins dealing with the general question of conveyance losses on various irrigation projects. An examination of those bulletins indicates that many irrigation systems in the San Joaquin Valley have an average conveyance loss far in excess of 40 per cent. One very large system has had a conveyance loss of 55.2 per cent over a period of five years, while another is estimated at 57.9 per cent. In the same bulletin is a table referring to four United States reclamation projects, built by government engineers, and on these four projects the lowest conveyance loss is 42 per cent and the highest 51.4 per cent, the average being 46.8 per cent.

In the second place, respondents, as a matter of law, have the right to divert by means of earthen ditches. They cannot be compelled to construct impervious conduits in order that seepage water may be made available to appellant. An appropriator is not compelled either to irrigate in the most scientific manner known or to divert in the most scientific manner known. In *Joerger* v. *Pacific Gas & Electric Company,* 207 Cal. 8, 23 [276 Pac. 1017], the rule is stated as follows:

''While an appropriator can claim only the amount which is necessary to properly supply his needs, and can permit no water to go to waste, he is not bound, as here claimed, to adopt the best method for utilizing the water or take extraordinary precautions to prevent waste. He is entitled to make a reasonable use of the water according to the custom of the locality and as long as he does so, other persons cannot complain of his acts. The amount of water required to irrigate his lands should, therefore, be determined by reference to the system used, although it may result in some waste which might be avoided by the adoption of another or more elaborate and extensive distribution system. (Farnham on Waters, sec. 675; Wiel on Water Rights, 3d ed., sec. 481; *Barrows* v. *Fox,* 98 Cal. 63 [32 Pac. 811].)''

In view of the retrial, and in concluding this portion of this opinion, the following observations are pertinent. It must be remembered that respondents' appropriative rights long antedate any right of the appellant to any water at all for use on nonriparian lands. The prior rights of respondents, regardless of the great needs of appellant, must

be protected. Respondents have developed a system of diversion and use on the Delta that has made that region one of the most prosperous and productive portions of California. We cannot hold, for reasons already stated, that respondents' methods of diversion and methods of use are wasteful. If appellant sincerely desires to save some of the conveyance loss, on the retrial, it can offer to defray the expenses of straightening some of the major ditches, or of building, in some cases, impervious ditches. Moreover, the trial court should not lose sight of the fact that this is an equity case. The equity courts possess broad powers and should exercise them so as to do substantial justice. Heretofore, the equity courts, in water cases, apparently have not seen fit to work out physical solutions of the problems presented, unless such solutions have been suggested by the parties. But it should be kept in mind that the equity court is not bound or limited by the suggestions or offers made by the parties to this, or any similar, action, For purposes of illustration, if the trial court, on the retrial, comes to the conclusion, based upon proper evidence, that a substantial saving can be effected at a reasonable cost, by repairing or changing some of the ditches, as above mentioned, it undoubtedly has the power regardless of whether the parties have suggested the particular physical solution or not, to make its injunctive order subject to conditions which it may suggest and to apportion the cost thereof as justice may require, keeping in mind the fact that respondents have prior rights and cannot be required lawfully to incur any material expense in order to accommodate appellant. Other physical solutions, such as the possible impounding of some of the water during periods, if any, when it is not needed by respondents, whereby some water can be made available to appellant without injury to respondents may suggest themselves. Appellant has suggested one such plan, the construction of an impervious bypass to carry some of the waters of the Lower Kaweah River over the cone of depression created by the pumping of appellant. An examination of the specific plan suggested by appellant clearly shows that it is not adequate to protect respondents. Not only did it not cover the entire cone of depression clearly shown to exist by respondents' witnesses, particularly upstream from the rancho, but it failed to provide properly

for injury necessarily resulting to certain of respondents' diversion ditches in the basin, and entirely disregarded the induced seepage to the St. Johns River. It may be, however, that the idea of a bypass has some merit. It may be that a proper plan can be worked out whereby a bypass can be constructed so that the respondents' rights will not be injured by appellant's pumping operations.

In attempting to work out any physical solution that may suggest itself, or for any other purpose the trial court may deem sufficient, it seems well to refer to what was recently said by this court in the Peabody case, *supra*, on this general subject (p. 373):

"If the attitude of the parties in a particular case be such as to embarrass the court in the proper determination of the case in view of a larger public interest involved and for the protection of all concerned, or for other sufficient reasons, the court might well invoke the aid of the division of water rights of the board of public works under sec. 24 of the Water Commission Act (Stats. 1931, p. 2421; Deering's Gen. Laws, vol. 3, p. 5017) in the determination of the rights to water and the use of water in accordance with the constitutional policy. (See *Wood* v. *Pendola,* 1 Cal. (2d) 435 [35 Pac. (2d) 526].) The purpose of that state authority to safeguard rights in the use of water for domestic and agricultural purposes against a subsequent appropriator was evidenced in the case of *East Bay Municipal Utility District* v. *Department of Public Works,* 1 Cal. (2d) 476 [35 Pac. (2d) 1027]."

By section 24, above referred to, the trial court, in water cases, in its discretion, with or without a request from the parties, may order a reference to the state water commission, or it may refer the cause to the commission for investigation and report upon any one, or more, or all of the physical facts involved. The procedure outlined in the section seems well suited to cases as complicated as most water cases. The facilities of the commission can, in this manner, be made available to the trial court and that court can thus secure independent and impartial expert advice not colored by personal interest. Incidentally, the procedure outlined in this section will secure representation of the state in such actions, thus insuring the protection of the rights of the public.

Also, in view of the retrial, some mention should be made of the priorities between the various respondent appropriators. The trial court stated in its findings that it made no findings as to the priorities or rights existing between the respective plaintiffs and interveners, as against each other, and that the findings were not intended to affect the rights of the plaintiffs and interveners, as against each other. A similar provision was incorporated in the judgment. As an abstract proposition, such findings embody a sound principle of law. Of course, ordinarily, a verdict fixing the rights of several plaintiffs, as against a defendant, would not be *res judicata* in a subsequent action between those plaintiffs. That is apparently what the trial court had in mind. But in the present case, there is also another principle involved. As an integral part of their case, each of the respondents herein had the burden of proving when the amount diverted by it was actually diverted. The appropriator is limited not only by the amounts diverted in the past, but also to the times it diverted the water in the past. If, in fact, as appellant claims, there existed a fixed schedule of priorities among the various respondent appropriators and, if such schedule was actually observed among such parties and if, as appellant claims, under this schedule of priorities, the diversions of some of the appropriators were so limited and postponed that they could not and did not take the water except during a limited period, obviously, such appropriator, with such a limited right, could not establish a right to take the water for the entire year. Stated another way, if any appropriator's right in the past has been so limited by reason of prior appropriations by others that it actually did not get and use water in certain periods of the year, obviously it could acquire no right as against appellant to a continuous flow for the entire year. During the course of this trial, it developed that there were two river associations, one for the St. Johns and one for the Lower Kaweah. Each of the associations consisted of the appropriators on that river and acted in the interests of all its members. During the course of the trial, there was introduced into evidence by respondents themselves a so-called schedule of priorities supposedly existing among the members of each association. If this schedule of priorities shows the actual practice on each river, then, according to appel-

lant, it is mathematically demonstrable that some of respondents' ditches did not and could not receive any water during certain portions of the year. On the retrial, it would seem to be an indispensable part of respondents' proof to show how and when the water was actually diverted by them in the past and thus incidentally to show the priorities actually existing between the parties.

For the guidance of the trial court, some mention also should be made of several other points. The trial court found that there was no surplus of water in the delta from which the appellant could take 25,000 acre feet annually, or any other fixed quantity, without injury to respondents. That finding, however, is necessarily based on the findings which fixed the amounts awarded to each appropriator. These awards, as we have already held, are unsupported, and so the finding that there is no surplus falls with them. That will be one of the main issues to be determined on the retrial.

The last main point necessary to be discussed is whether or not the evidence shows that appellant's pumping has caused or will cause seepage losses from the St. Johns River at all, or has caused, or will cause, seepage losses from the Lower Kaweah River in excess of 10 second feet. First as to the seepage losses from the St. Johns River. The trial court found that the pumping operations of defendant have created a cone of depression extending beyond the limits of the Rancho de Kaweah; that the cone of depression is approximately $2\frac{1}{4}$ miles in width from northwest to southeast and 4 miles in extent from northeast to southwest; that the cone of depression extends under the St. Johns River for a distance of approximately five miles; that the well of defendant in closest proximity to the St. Johns River is situated about one-half mile south therefrom. The court also found that the pumping operations of defendant and the cone of depression created thereby, extended under certain designated diversion ditches or canals of respondents located in the basin. Several of the wells are located within two to three hundred feet of these ditches. The appellant makes a determined assault on these findings. It reviews at length the theories of *its* experts, all of whom testified that appellant's pumping did not affect the surface flow of the St. Johns. After an analysis of the evidence produced by re-

spondents on this point, we are of the opinion that the expert and lay testimony produced by respondents overwhelmingly supports the above findings. Respondents not only proved these points by opinion evidence, but also by factual evidence, which proves the correctness of the trial court's findings to a mathematical certainty. The peculiar geological formation of the basin, with its two outlets through the Venice hills, one for each river, and with the impervious red lands to the north, makes the basin a large underground reservoir. The Venice hills present an effectual barrier to the underground waters of the basin percolating away therefrom in appreciable quantities. Pumping operations of the appellant materially decreasing the underground supply caused induced seepage from the St. Johns River and the above-mentioned diversion ditches. Appellant's contention that the bed of the St. Johns River is composed almost entirely of impervious materials through which the waters in the stream cannot percolate and, hence, that there can be no induced seepage is not borne out by the evidence. The evidence produced by respondents proved quite conclusively that while there are some small and isolated areas of impervious material, the larger portion of the bed of this river north of the rancho is composed of sands and alluvium, through which water will percolate rapidly. The evidence clearly shows that there is a direct contact between the waters in the stream and the underground waters, and that the removal of the latter by the pumping operations of appellant results in the removal of water from the stream.

As to the Lower Kaweah River, the appellant admits that its pumping operations directly diminish the flow of this river, but contends that they do not do so to the extent fixed by the trial court. The trial court found that the cone of depression extends under the bed of the Lower Kaweah River for about four miles; that the pumping operations of appellant have diminished and in the future "will diminish the late surface flow of the Lower Kaweah River in amounts at all times in excess of ten cubic feet of water per second, and that the amount of said diminution has varied during said pumping operations, from day to day and season to season, and that said operations of defendants on various occasions and for many a day have diminished the late surface flow of the Lower Kaweah River to an extent in excess

of forty (40) cubic feet of water per second . . . " This finding is amply supported by the evidence. The plan offered by appellant to prevent this loss, that is, the construction of an impervious bypass over this area, to carry some of the water, for reasons already discussed, was not adequate. On the new trial, perhaps a physical solution better fitted to the needs of the situation will be suggested.

No useful purpose would be served by retrying the issues presented by the question as to whether the pumping operations of the appellant have in the past caused and, if continued, will cause seepage losses from the two rivers and the designated diversion ditches, as found by the trial court. The portions of the judgment dealing with this question should, therefore, be affirmed.

The retrial of this action need not be a protracted one. The trial court, upon proper application, can and undoubtedly will grant a preliminary injunction that will protect all parties pending and during the new trial. Large portions of the evidence can and probably will be stipulated to, and many other portions of the evidence introduced on this trial will not be necessary. As to the appropriators, the issues on the retrial will be greatly simplified. The respondents must prove the quantities of water diverted by them in the past and that such waters were devoted to beneficial uses. Respondents' methods of use and methods of diversion have, in this opinion, been held to be reasonable. If appellant can show, after respondents' prior rights are filled, that there is a surplus, it will be entitled to that surplus. If the appellant or the trial court can discover a reasonable physical solution so as to save any portions of the waters without injury to respondents, such physical solution undoubtedly will be enforced by the trial court.

For the foregoing reasons, the judgment appealed from is reversed, affirmed and modified, and, as modified, affirmed, as follows:

1. By reason of the stipulation of the parties hereinafter named, the court below is directed to modify the judgment appealed from as between respondents and interveners H. E. Wright, S. E. Railsback, Gilbert H. Russell, Gordon Hall, James K. Moffitt, Joseph G. Hooper, Willys Hall, George A. Smith, Nellie M. Smith, and Alice C. Hall and appellant in the following particulars:

(a) By adding to paragraph X of said judgment, at the end thereof, the following: "except that said Defendant Lindsay-Strathmore Irrigation District is entitled and has the right, as against said Interveners and each of them, their successors and assigns, to pump, take, divert and carry away from the said Kaweah River or any of its branches or extensions, or from the St. Johns River or any of its branches or extensions, or from the Rancho de Kaweah, or from the underground water underlying the said Rancho de Kaweah or what is known as the Kaweah Delta, without any objection or interference on the part of said Interveners, their successors or assigns, or any of them, in each and every calendar year, at such time or times, and at such rate or rates, as said defendant may desire, such amount of water as shall, in any year, equal but not exceed the amount of water which would be produced or discharged by an average continuous flow, during such year, of 35 cubic feet of water per second; and to transport said quantity of water so pumped, taken, diverted or carried away by said Defendant to and upon the lands within the boundaries of said Lindsay-Strathmore Irrigation District, as they are now defined, for use upon said lands for irrigation and domestic uses and other beneficial purposes."

(b) By adding to paragraph XIV of said judgment, at the end thereof, the following: "except that as against said Interveners, H. E. Wright, S. E. Railsback, Gilbert H. Russell, Gordon Hall, James K. Moffitt, Joseph G. Hooper, Willys Hall, George A. Smith, Nellie M. Smith, Alice C. Hall and each of them, their successors and assigns, said Defendant may, notwithstanding anything in this paragraph or in this judgment to the contrary contained, pump, take, divert, and carry away from the said Kaweah River or any of its branches or extensions, or from the St. Johns River or any of its branches or extensions, or from the Rancho de Kaweah, or from the underground water underlying the said Rancho de Kaweah, or said Kaweah Delta, in each and every calendar year, at such time or times, and at such rate or rates, as said defendant may desire, such amount of water as shall, in any year, equal but not exceed the amount of water which would be produced or discharged by an average continuous flow, during such year, of 35 cubic feet of water per second, and to transport such amount

of water to and upon the land within the boundaries of said Lindsay-Strathmore Irrigation District as they are now defined, for irrigation and domestic uses and other beneficial purposes.''

(c) By eliminating from said judgment paragraph XX thereof.

The judgment, when modified in the several particulars above mentioned, stands affirmed, as between these parties.

2. In accordance with the stipulation and agreement of the parties hereinafter named, the motion of appellant to reverse the judgment in favor of the Mineral King Fruit Company is hereby granted and the cause remanded to the court below with instructions to dismiss the action of the plaintiff, Mineral King Fruit Company, with prejudice.

3. By reason of the stipulation of the parties hereinafter named, the court below is hereby directed to modify the judgment appealed from as between respondent and intervener Marietta R. Gray and appellant in the following particulars:

(a) By adding to paragraph XI of said judgment, at the end thereof, the following: ''except that the said defendant Lindsay-Strathmore Irrigation District is entitled to and has the right as against said Intervener Marietta R. Gray, her successors and assigns, to pump, take, divert and carry away from the underground water underlying the said Rancho de Kaweah, without any objection or interference on the part of said Intervener, her successors or assigns, or any of them, irrespective of whether such pumping, diversion, taking or carrying away of said water shall diminish, lessen, or interfere with the flow of water in said Kaweah River, or any of its branches or extensions,' or any natural water course, ditch or canal, or any underground waters, in each and every calendar year at such time or times, and at such rate or rates as said defendant may desire, such amount of water as shall in any year equal but not exceed the amount of water which would be produced or discharged by an average continuous flow during such year of 35 cubic feet per second, and to transport said quantity of water so pumped, taken, diverted or carried away by said defendant to and upon the lands within the boundaries of said Lindsay-Strathmore Irrigation District as they are now defined, for

use upon said lands for irrigation and domestic uses and other beneficial purposes."

(b) By adding to paragraph XIV of said judgment, at the end thereof, the following: "except that as against said Intervener Marietta R. Gray, her successors and assigns, said Defendant may, notwithstanding anything in this paragraph or in this judgment to the contrary contained, pump, take, divert and carry away from the underground water underlying said Rancho de Kaweah in each and every calendar year, at such time or times, and at such rate or rates, as said defendant may desire, such amount of water as shall, in any year, equal but not exceed the amount of water which would be produced or discharged by an average continuous flow, during each year, of 35 cubic feet of water per second, and to transport such amount of water to and upon the land within the boundaries of said Lindsay-Strathmore Irrigation District as they are now defined, for irrigation and domestic uses and other beneficial purposes."

(c) By eliminating from said judgment paragraph XXI thereof.

The judgment, when modified in the several particulars above mentioned, stands affirmed as between these parties.

4. As to the various riparian respondents, including the respondents impleaded, whose rights have not been settled by compromise or stipulation, those portions of the judgment fixing the riparian nature of their respective parcels of land are affirmed.

5. As to the riparian and overlying respondents, including the impleaded parties, whose rights have not been settled by compromise or stipulation, the judgment appealed from is reversed, except as limited by paragraphs 4 and 6 hereof, with directions to the trial court to proceed with the retrial as to these parties, in accordance with the views expressed in the body of this opinion.

6. As to all the parties, those portions of the judgment declaring that defendant's pumping has diminished and will, if continued, diminish the surface flow of both rivers and some of the diversion ditches, and fixing the extent of the cone of depression created by such pumping, are affirmed.

7. As to the appropriators, except as limited by other portions of this order, and particularly by paragraph 6 hereof, the judgment appealed from is reversed, with directions to

the trial court to proceed with the retrial as to these parties, in accordance with the views expressed in the body of this opinion.

8. All parties to bear their own cost on this appeal.

Shenk, J., Curtis, J., Nourse, J., *pro tem.,* Seawell, J., and Preston, J., concurred.

A petition for a rehearing was denied by the Supreme Court on May 29, 1935, and the following opinion then rendered thereon:

THE COURT.—Respondents' petition for a rehearing is denied. Appellant's petition for correction and modification of the opinion is likewise denied. While it is true, as urged by appellant, that there is no specific paragraph of the judgment of the trial court directly referring to the matters affirmed by paragraph 6 of the order of this court, it is also true that many portions of the judgment are necessarily based thereon. Several paragraphs of the judgment of the trial court provide that the rights of the respondents must be satisfied before the appellant is entitled to pump any water for nonriparian uses from the waters underlying the Rancho de Kaweah. Those portions of the judgment can only be understood by reference to the findings wherein the physical characteristics of the basin, the effect of appellant's pumping on the surface flow of the two rivers, and the extent of the cone of depression are set forth in detail. As set forth in the opinion heretofore filed in this case, the evidence. produced by respondents overwhelmingly supports the findings as to the effect of any pumping on the Rancho de Kaweah on the surface flow of the two rivers, and on the designated diversion ditches, upon which the portions of the judgment above referred to are based. Under the circumstances it would be an unjustified burden to require respondents, on the new trial, to reestablish the matters referred to. Appellant concedes that an appellate court may, in ordering a new trial, limit such new trial to particular issues, letting certain findings stand upon such new trial. For all practical purposes that is precisely the legal effect of paragraph 6 of the order of this court. It was intended by that paragraph to exclude from considera-

tion on the new trial all issues mentioned in paragraph 6, and to let the findings in reference thereto, and the portions of the judgment supported thereby, stand on such retrial.

The other matters raised by appellant do not require discussion.